850 F.2d 64
 Violet A. SAVAGE, Elbert Hargesheimer, III, and Paul A.
Angrisano, Plaintiffs- Appellees,
v.
Dennis T. GORSKI, Individually and as Erie County
Executive-Elect; James V. Stanton, Individually
and as Chairman of the Transition
Advisory Committee for the
Erie County
Executive-
Elect, Defendants,
Dennis T. Gorski, Defendant-Appellant.
 Nos. 908, 981, 982, Dockets 88-7019, 88-7027 and 88-7029.
 United States Court of Appeals,
Second Circuit.
 Argued April 4, 1988.
Decided June 20, 1988.
 
 Kenneth A. Schoetz, First Asst. Co. Atty., Buffalo, N.Y. (Patrick H. NeMoyer, Erie Co. Atty., of counsel), for defendant-appellant.
 Ralph Markus Mohr, Lancaster, N.Y., for plaintiff-appellee Savage.
 Michael F. Perley, Buffalo, N.Y., for plaintiffs-appellees Hargesheimer and Angrisano.
 Before OAKES, WINTER, Circuit Judges, and CEDARBAUM, District Judge.*
 OAKES, Circuit Judge:
 
 
 1
 This appeal is by Dennis T. Gorski, who assumed office as County Executive for Erie County on January 1, 1988. Gorski was preliminarily enjoined by the United States District Court for the Western District of New York, John T. Elfvin, Judge, from terminating the employment of three Erie County employees on the theory that firing them would violate their First and Fourteenth Amendment rights. The employees are Violet A. Savage, Confidential Secretary to the Director of the Erie County Correctional Facility; Elbert Hargesheimer, III, Coordinator for Pre-Trial Release Services in Erie County; and Paul A. Angrisano, First Deputy Service Officer for the County Veterans Service Agency. Each position is classified as "exempt under New York State Civil Service law." Because we believe that the plaintiffs failed to satisfy this circuit's standard for the issuance of a preliminary injunction, we reverse.
 
 
 2
 Gorski, a former New York State assemblyman, won a contested Democratic primary in September 1987, and won the November 3 general election for Erie County Executive with a plurality of nearly 90,000 votes out of 326,000 votes cast. He then requested from the Erie County Department of Personnel a list of permanent county employee positions not protected by statute or collective bargaining agreement. The list, entitled "Managerial/Confidential," contained 143 title positions and the name of each current job holder. Of the 8,000 employees in the County of Erie, only those 143 hold policy-making or confidential positions exempt under New York Civil Service laws. One of Gorski's aides removed the names, added the salary range for each position, and turned over the list to Gorski. Gorski then selected the positions he wished to fill with individuals he believed were qualified to assist him in the process of fulfilling his campaign promises.
 
 
 3
 On November 9, 1987, the former deputy county executive sent a memo to the head of each county department, stating that she had been advised that all "policy makers" would be replaced and that anyone wishing to apply for a position with the Gorski administration should submit a resume through the county personnel department. None of the appellees submitted a resume to the personnel department, although Angrisano, the Veterans Service Officer, submitted a resume to the Gorski Transition Advisory Committee. His was one of nearly 2,000 received.
 
 
 4
 It should be noted that the list from which Gorski determined which positions he desired to fill with his appointments did not contain the name, political affiliation, or political activity of any individual employed in county government. There is no indication in our record that Gorski at any time sought to determine the political affiliation or political activity of any individual on the list.
 
 
 5
 On December 14, 1987, termination notices were sent to sixty-nine county employees, including Savage, Hargesheimer, and Angrisano. Each notice stated that Gorski would be appointing an individual to fill each position and that "your services are no longer needed effective the close of business December 31, 1987." On December 22, ten of the dismissed employees sought to obtain a temporary restraining order (TRO) to prevent their dismissals, pursuant to 42 U.S.C. Sec. 1983 (1982). A TRO was not issued, but Judge Elfvin held a hearing on December 30 and 31, at which Savage, Hargesheimer, and Angrisano each testified.
 
 
 6
 Savage is the Confidential Secretary to the Director of the Erie County Correctional Facility. She testified that her family is active in Republican Party politics in Erie County, her husband being a Republican Councilman in the Town of Alden and her son a member of the Town Republican Committee. She also participates in various fundraising efforts for the Republican Party. She was hired as senior clerk stenographer at the correctional facility in 1977, and her position was made an exempt job in conformity with a county policy, effective as of January 1, 1986, to provide department heads with confidential secretaries. She is one of twelve such secretaries in Erie County government. According to the position's job description, Savage acts on phone messages to the superintendent involving confidential matters such as personnel actions, labor relations, and legal actions, and may be responsible for compiling confidential reports. She is also responsible for personnel records and files for 180 employees, as well as confidential files of the Superintendent. The job description states that, while the Confidential Secretary works under the general supervision of the Superintendent, there is "leeway allowed for the exercise of independent judgment regarding departmental policies and procedures." Savage did not submit her resume or request for job retention prior to receiving her termination notice; however, one day prior to bringing this lawsuit, and seven days after receipt of the termination notice, she did send a letter to the Gorski Transition Advisory Committee requesting job retention. Gorski testified that prior to the lawsuit he did not know who Savage was.
 
 
 7
 Hargesheimer's job as Coordinator for Pre-Trial Services calls for "planning, implementing and coordinating" the county's Pre-Trial Release Program. The part-time position, for which he is paid approximately $23,000 per year, also permits him to conduct his law practice in the town of Hamburg. According to its job description, the position involves supervising a number of Deputy Confidential Investigators, preparing and disseminating public information materials about the program, and coordinating program activities involving police agencies, prosecutors, and the courts. Hargesheimer testified that he has no discretion in determining who should be released from jail while awaiting trial, claiming that state guidelines are determinative on the issue.
 
 
 8
 Hargesheimer is "[m]ore than active" in local Republican Party politics and has been a Republican committeeman since 1968, an officer in the Republican town committee of Hamburg since 1978, and counsel to the Erie County Republican Party since 1980. He did not submit a request for job retention until after being notified of his termination. Gorski testified that he was aware of Hargesheimer's party affiliation, but did not know that Hargesheimer was director of the pretrial program when he decided to fill the position with his own appointee.
 
 
 9
 Angrisano's service as First Deputy Service Officer for the County Veterans Service Agency was a full-time position having an annual salary of in excess of $32,000. He maintains outside contacts with veterans' service organizations, attends public meetings regarding county proposals affecting veterans, and gives extemporaneous talks on county veterans' programs. While Angrisano does not have discretion with respect to benefits awarded to veterans, he did create an Agent Orange program for Erie County and has performed various tasks not listed in his job description. He applied in November for retention as First Deputy Service Officer. Angrisano is a member of the Republican Party. Gorski testified that he did not know Angrisano's political affiliation when he decided to terminate the current holder of the First Deputy Service Officer position. Angrisano did not agree, according to his testimony, with Gorski's view that Vietnam veterans were underemployed and that his agency was to blame.THE DISTRICT COURT'S DECISION
 
 
 10
 Although Judge Elfvin granted the preliminary injunction on December 31 without explaining his rationale, he later stated his reasons in an opinion. Savage v. Gorski, Nos. 87-1559E-64E, -1566E-67E, -1590E, slip op. at 13 (W.D.N.Y. Mar. 23, 1988) (available on WESTLAW, 1988 WL 27564). There, after recounting the facts and noting the Second Circuit test for a preliminary injunction, he stated that Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion), and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), hold that the firing of public employees solely on the basis of their political affiliations violates the First Amendment and that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (Quoting Elrod, 427 U.S. at 373, 96 S.Ct. at 2690.) He noted that Elrod protected only persons serving in nonpolicymaking positions from termination based solely on their political affiliations, but emphasized that Branti refined the analysis, so that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." (Quoting Branti, 445 U.S. at 518, 100 S.Ct. at 1295.) Judge Elfvin went on to hold that the principles of Elrod and Branti apply to the firings involved here since there was "no question that their affiliation with the Republican Party was a 'substantial' or 'motivating' factor for their discharge." He then held that "[t]he fact that Gorski did not know the names or the party affiliations of the people to whom he ordered termination letters be sent, does not change [the] fact [that they were registered Republicans who worked within the outgoing Republican County Executive's administration] or convince the court otherwise." Judge Elfvin found "that Republicans were being discharged during the transition without any apparent reason except that they were Republicans and part of the past administration," and that these three individuals did not fall within the policymaking exceptions of Elrod and Branti.
 
 DISCUSSION
 
 11
 The Second Circuit's standard for the issuance of a preliminary injunction "clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979). Loss of employment does not in and of itself constitute irreparable injury. Sampson v. Murray, 415 U.S. 61, 90-91, 94 S.Ct. 937, 952-53, 39 L.Ed.2d 166 (1974). While the firing of public employees solely for their political affiliations may violate the First Amendment, Branti, 445 U.S. at 517, 100 S.Ct. at 1294; Elrod, 427 U.S. at 373, 96 S.Ct. at 2689, and this interference with First Amendment rights may constitute irreparable harm, Elrod, 427 U.S. at 373, 96 S.Ct. at 2689, such is not the case here. When the preliminary injunction in Elrod was sought, nonpolicymaking, nonconfidential employees were threatened with immediate discharge for refusing to change their political affiliations. 427 U.S. at 351, 96 S.Ct. at 2678 (process server, bailiff and security guard, and other employees at sheriff's office). Here appellees did not allege, nor did the court find, that they were being coerced into joining the Democratic Party; they claimed only that they were associated with an administration with whose philosophy and beliefs Gorski disagrees.
 
 
 12
 The precise question thus becomes whether appellees' discharge pending the outcome of their case before the district court would have a chilling effect on appellees' First Amendment rights sufficient to constitute irreparable harm. Since the source of the "chill" is the permanent loss of appellees' jobs, retaining those positions pending resolution of the case will do nothing to abate that effect. As this court said in American Postal Workers Union v. United States Postal Service, 766 F.2d 715, 722 (2d Cir.1985), cert. denied, 475 U.S. 1046, 106 S.Ct. 1262, 89 L.Ed.2d 572 (1986):
 
 
 13
 [W]e fail to understand how a chilling of the right to speak or associate could logically be thawed by the entry of an interim injunction, since the theoretical chilling of protected speech ... stems not from the interim discharge but from the threat of permanent discharge, which is not vitiated by an interim injunction.
 
 
 14
 Since reinstatement and money damages could make appellees whole for any loss suffered during this period, their injury is plainly reparable and appellees have not demonstrated the type of harm entitling them to injunctive relief.
 
 
 15
 It is also difficult to see how appellees can succeed on the merits of their claims. See Jackson Dairy, 596 F.2d at 72. First, it appears that appellees Savage and Hargesheimer did not comply with the procedure for seeking or retaining jobs in the new administration. This fact alone suggests that appellees' constitutional claim may be foreclosed. See Simmons v. Lyons, 746 F.2d 265, 268 (5th Cir.1984) (plaintiffs' failure to apply for reappointment is fatal to their section 1983 claim that failure to reappoint them was grounded upon protected political activity and expression).
 
 
 16
 Second, appellees Savage and Angrisano do not offer any evidence that Gorski was aware of their political affiliation in determining which positions to terminate. This failure, too, has been held to bar plaintiffs from bringing section 1983 actions on the grounds of discharge based on political beliefs. See Laskaris v. Thornburgh, 733 F.2d 260, 265 (3d Cir.), cert. denied, 469 U.S. 886, 105 S.Ct. 260, 83 L.Ed.2d 196 (1984). Rather, appellees rely on their records of competence and the fact that Gorski is a Democrat succeeding a Republican administration to infer that the firings must be politically motivated. This, we think, is insufficient.
 
 
 17
 Third, since all three appellees hold non-civil service positions, if they are to be protected under the First Amendment, they must come within the scope of the Supreme Court's holdings in Branti and Elrod that certain patronage dismissals violate the guarantee of free political belief and association. In Elrod, it was suggested that the same protection would not apply to policymaking employees in order to protect the power of an elected administration to implement its policies. 427 U.S. at 367, 96 S.Ct. at 2686. The Court in Branti, however, in dictum, attempted to narrow the category of public employees outside the First Amendment's protection by reformulating the test for exemption:
 
 
 18
 [T]he ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.
 
 
 19
 445 U.S. at 518, 100 S.Ct. at 1295.
 
 
 20
 Read literally, the Branti formulation would exempt very few positions from protection--including, it would seem, presidential cabinet officers and United States Attorneys. See id. at 525, 100 S.Ct. at 1298 (Powell, J., dissenting). A better interpretation of the language in Branti is to read it as saying that political affiliation is an appropriate requirement when there is a rational connection between shared ideology and job performance, a reading which would exempt from protection most policymaking and confidential employees, but not--as in the Court's example--a football coach at a state university, id. at 518, 100 S.Ct. at 1294. Any other decision would severely handicap an incoming administrator's ability to carry out his proposed policies, thereby undercutting the effects of the electorate's vote.
 
 
 21
 Only a strict application of the Branti dictum would bring appellees within the shelter of the First Amendment. All three have, relatively speaking, high salaries, a common characteristic of policymaking positions. See Tomczak v. Chicago, 765 F.2d 633, 642 (7th Cir.), cert. denied, 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985); Ecker v. Cohalan, 542 F.Supp. 896, 901-02 (E.D.N.Y.1982). Savage's secretarial position involves confidentiality, discretion in disseminating information to the public, and independent judgment regarding department policies and procedures. Hargesheimer's part-time job as Coordinator of Pre-Trial Services involves making recommendations to judges which, while based on a point system, would still involve policymaking "at the questionable fringes," Garretto v. Cooperman, 510 F.Supp. 816, 819 (S.D.N.Y.1981), aff'd, 794 F.2d 676 (2d Cir.1984), as would the supervisory duties involved in coordinating the program. Similarly, Angrisano's $32,339 per year position involves being a liaison with the public and veterans' organizations, as well as overseeing the office and interviewing veterans to determine whether they qualify for benefits. There are sufficient indicia here to locate all three positions at the policymaking end of the Erie County government spectrum, where the individual employee's political or social philosophy can make a difference in the implementation of programs.
 
 
 22
 Moreover, determining whether it makes sense to exempt appellees' positions from First Amendment protection involves many of the same factors that New York State already has considered in exempting these public employment positions from its constitutionally-mandated civil service system. "The criteria ... are the confidential nature of the position, the performance of duties which require the exercise of authority or discretion at a high level, or the need ... to have some expertise or personal qualities which cannot be measured by a competitive exam." Burke v. Axelrod, 90 A.D.2d 577, 578, 456 N.Y.S.2d 135, 137 (3d Dep't 1982). Here, Savage's duties were confidential (Judge Elfvin noted that the new correction department head, once appointed, could legitimately remove her); Hargesheimer was exempt from taking a competitive exam; and Angrisano's duties required the exercise of discretion at an important level. Both the interests of federalism and the conservation of judicial resources would ordinarily be better served by the federal courts' giving substantial deference to the state's judgment where government positions are so defined. Otherwise, federal courts will be embroiled in determining at each change of state or local administration which positions are appropriately within the political patronage system. Such a determination not only creates the possibility of a super-civil service overseen by the courts, but allows the federal judiciary to intrude undesirably into the very structure of state and local governments.
 
 Finally, as Judge Weinstein has noted:
 
 23
 Though rarely lauded in party platforms and political speeches, patronage is a policy; the decisions whether to dispense it and how are policy decisions; and the patronage dispenser is among the most powerful of our political sachems. Failure to recognize this fact of political life would yield the paradoxical result that in attempting to curtail future patronage, the courts had merely entrenched existing patronage systems.
 
 
 24
 Ecker v. Cohalan, 542 F.Supp. at 903. Where, as here, employees terminated by an incoming administrator can show no special circumstances (as in Elrod or Branti ) which would make deference to such electoral and legislative determinations inappropriate, the court should accept those judgments.
 
 
 25
 While there is fair ground for litigation, the balance of hardships does not tip in appellees' favor. See Jackson Dairy, 596 F.2d at 72. With little probability of success on the merits, neither prong of the Jackson Dairy test is met. Therefore, the grant of a preliminary injunction was an abuse of discretion. As the late Judge Craven put it,
 
 
 26
 When the grant or denial of interim injunctive relief is reviewed, it is simplistic to say or imply, as we sometimes do, that it will be set aside only if an abuse of discretion can be shown.... A judge's discretion is not boundless and must be exercised within the applicable rules of law or equity.
 
 
 27
 Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 193 (4th Cir.1977), quoted with approval in Friendly, Indiscretion About Discretion, 31 Emory L.J. 747, 777 (1982).
 
 
 28
 Reversed.
 
 
 
 *
 Of the United States District Court for the Southern District of New York, sitting by designation