**Magdy S. SHADY, M.D., Plaintiff,**

**v.**

**George W. TYSON, M.D., individually and in his official capacity as Chair of the Department of Neurological Surgery of University Hospital, University Medical Center and the School of Medicine at SUNY at Stony Brook; Norman H. Edelman, M.D., individually and in his official capacity as Dean of the School of Medicine and Vice President of University Medical Center and the Health Sciences Center of SUNY at Stony Brook; Shirley Strum Skenny, Ph.D., individually and in her official capacity as President of SUNY at Stony Brook; State University of New York at Stony Brook; University Hospital of the Health Sciences Center of SUNY at**

Stony Brook; University Medical Center of SUNY at Stony Brook; The Health Sciences Center of SUNY at Stony Brook; The School of Medicine of SUNY at Stony Brook; New York Spine & Brain Surgery, PC, Defendants.

No. 97 CV 6806(ADS).

United States District Court, E.D. New York.

April 27, 1998.

Beldock Levine & Hoffman L.L.P., New York City by Cynthia Rollings, of counsel, for Plaintiff.

Office of the New York State Attorney General, Mineola, NY by Assistant Attorney General Robert K. Drinan, for defendants Goerge W. Tyson, M.D., Shirley Strum Kenny, Ph. D., State University of New York at Stony Brook, University Medical Center of SUNY at Stony Brook, Health Sciences Center of SUNY at Stony Brook, School Of Medicine of SUNY at Stony Brook.

Hogan & Hartson, Washington, DC, by Steven I. Routh, of counsel, for the defendant New York Spine & Brain Surgery, PC.

## BENCH MEMORANDUM

SPATT, District Judge.

This lawsuit arises out of the claims of the plaintiff, Magdy S. Shady ("Shady" or the "plaintiff") against the defendants, George W. Tyson, M.D. ("Tyson"), Norman H. Edelman, M.D. ("Edelman"), Shirley Strum Kenny, Ph.D. ("Kenny"), State University of New York at Stony Brook ("SUNY"), Uni-

versity Hospital of The Health Sciences Center of SUNY at Stony Brook ("University Hospital"), University Medical Center of SUNY at Stony Brook ("University Medical Center"), Health Sciences Center of SUNY at Stony Brook ("Health Sciences Center"), School of Medicine of SUNY at Stony Brook ("School of Medicine") and the New York Spine & Brain Surgery, PC ("Spine & Brain").

The plaintiff is a neurosurgeon and an Assistant Professor of Neurological Surgery at SUNY. The gravamen of his complaint is that as a consequence of his "voicing concerns relating to the care and treatment of patients at University Hospital, he is on the verge of losing his faculty appointment at SUNY Stony Brook as well as his hospital privileges." (Plaintiff's Memorandum of Law, at 2). The plaintiff filed this motion for a preliminary injunction by order to show cause pursuant to Fed.R.Civ.P. 65 seeking an order "enjoining and restraining defendants and each of them from taking any action adversely to affect plaintiffs faculty appointment or employment at the School for Medicine ... and/or plaintiffs medical staff appointment or clinical privileges at University Hospital, University Medical Center and/or Health Sciences Center ... and/or any of the terms and conditions of [his] employment or appointments or privileges based upon the events complained of in this action, including ... any action to implement the letter of non-renewal of plaintiff's appointment as Assistant Professor ... and/or to revoke or diminish plaintiff's medical staff appointment and clinical privileges at University Hospital, pending the final determination of this action."

## I. BACKGROUND

In October 1991, the plaintiff, a neurosurgeon, was appointed to the non-tenured position of Assistant Professor of Neurological Surgery, and was made a member of the Medical staff of University Hospital with full clinical privileges (Shady Aff., at ¶ 2), Since that time, he also has been a member of Spine & Brain, which is the faculty private practice of the Department of Neurological Surgery at University Hospital and Universi-

ty Medical Center at SUNY. Shady's original appointment letter stated that the appointment was "temporary" and would expire one year later (Letter from J. Oaks to Shady, dated October 2, 1991: Ex. A to Tyson Aff., ¶ 6). Since that time, Shady's temporary, non-tenured appointment has been renewed either annually or biannually, with each renewal letter specifying an end date for the appointment, subject to renewal (Tyson Aff., ¶ 6). Under the policies in place at SUNY Stony Brook, any faculty member who has held an appointment for over two years is entitled to one year notice of the nonrenewal (Tyson Aff., ¶ 6). According to Dr. Tyson, Chair of the Department of Neurological Surgery, Shady was an "at-will" employee who never had tenure or any other type of continuing appointment, and under the written policies of SUNY Stony Brook, non-renewal of his appointment does not require a showing of any cause, so long as the nonrenewal is "not tainted by an improper purpose." (Tyson Aff., ¶ 6).

In or about 1995, the plaintiff was invited to join the Surgical Review Committee ("SRC") at University Hospital. The SRC is a peer review committee responsible for "reviewing all surgery performed in the Hospital .. and evaluating the acceptability of the procedures taken." (Shady Aff., ¶ 5).

In July 1996, Dr. Tyson met with Shady to discuss his written evaluation of Shady's performance and status within the Department. Tyson aptly characterizes the evaluation as "mixed." He told Shady that while he possessed "above average technical skills," he nevertheless would "sometimes try to duck work," and "end[ed] up 'getting out' of many emergencies that I assign[ed] to him by passing them on to someone else or claiming [that he was unavailable .]" (Tyson Aff., ¶ 11). Tyson further informed Shady that the number of surgeries he performed was "well below the national average and ... that he needed a strategy to build his practice. In sum, I advised Dr. Shady that while he performed a number of functions well, the things he did not do well created a significant problem for the Department...." (Tyson Aff., ¶ 11). According to Tyson, since "Shady came to Stony Brook in 1991, the expenses related to

his clinical practice have exceeded the payments he brought into the Corporation in five of the seven fiscal years, including in each of the three most recent years." (Tyson Aff., ¶ 16). While Dr. Shady disputes the accuracy of Tyson's assessment of his productivity levels, he does not contest that he received the mixed evaluation in July 1996 which called into question his contributions to the Department (Shady Reply Aff., ¶¶ 21–27).

Approximately three months after this "mixed review," in or about the Fall of 1996, Shady told the Chair of the SRC that he was concerned about two surgeries performed by a fellow SUNY doctor in the Department. Shady's statements evidently prompted the SRC to investigate the other physician's surgeries. Thereafter, the plaintiff claims that he was informed by Tyson that he was being removed from the SRC because of his voicing these concerns about a fellow neurosurgeon.

Several months later, Tyson states that despite growing financial difficulties associated with Shady's lack of productivity, he nevertheless recommended to the Dean that Shady's appointment be renewed for an additional one-year term. Based on that recommendation, the Dean renewed Shady's appointment, by letter dated December 26, 1996, until October 14, 1997. Notably, Shady's appointment was renewed *after* the events surrounding the SRC.

Tyson alleges that by March 1997, "the continued and dramatic decline in Dr. Shady's billings, as well as further adverse changes in the financial position of the Department as a whole, convinced me that our practice could no longer support his salary and other substantial expenses.... I also was influenced by the fact that Dr. Shady, unlike the other members of the Department, had no defined sub-specialty within the field of neurosurgery. Dr. Shady, while a technically competent surgeon, possessed no skill that was unique within our practice and was attracting relatively few patients.... It was for this reason, and this reason alone, that I recommended to the Dean in March 1997 that Dr. Shady be provided with the twelve month notice of nonrenewal of his appointment provided for under the Stony Brook policy." The plaintiff then received a letter

from Tyson dated March 21, 1997, stating that the plaintiff's faculty appointment "will not be renewed when it expires, except for the purposes of providing . . . 12 months of advance notification of this fact." When the plaintiff wrote a letter of complaint to Dr. Edelman, Dean of the School of Medicine, in March 1997, he received a reply stating that his faculty appointment had been extended through April 15, 1998, at which time it would not be renewed (Shady Aff., at ¶ 35).

The plaintiff alleges that his faculty appointment was not renewed in retaliation for his having raised the "quality assurance questions" before the SRC. On November 18, 1997, the plaintiff filed a complaint in this Court based on a Section 1983 cause of action, claiming that he was terminated for exercising his First Amendment right to free speech, and that he was deprived of his property interests in his position without due process.

On March 26, 1998, more than a year after he was notified that his appointment would not be renewed, the plaintiff moves, by order to show cause, for a preliminary injunction, seeking the relief set forth at the outset of this decision. In support of his motion, the plaintiff asserts that he is "entitled to injunctive relief from this Court to address not only his and his patients' imminent loss, but in addition to redress the chilling effect [on First Amendment rights] such uncorrected retaliation will have [on him and] other physicians at SUNY Stony Brook, to the detriment of both [the plaintiff's] patients and public welfare as a whole." (Plaintiff's Memorandum of Law, at 2).

## II. DISCUSSION

### A. The Standard for Granting a Preliminary Injunction

■ A preliminary injunction is considered an "extraordinary remedy that should not be granted as a routine matter." *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir.1990); *see also Patton v. Dole*, 806 F.2d 24, 28 (2d Cir.1986); *Medical Soc'y of N.Y. v. Toia*, 560 F.2d 535, 538 (2d Cir.1977). In the seminal *Jackson Dairy Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per

curiam), the Second Circuit set forth the applicable standard in this Circuit to obtain preliminary injunctive relief. According to *Jackson Dairy*, the movant must clearly establish the following:

> (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions, going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Id.; see also Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir.1997); *Able v. United States*, 44 F.3d 128, 130 (2d Cir.1995); *Alan Skop, Inc. v. Benjamin Moore, Inc.*, 909 F.2d 59, 60 (2d Cir.1990) (per curiam); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 972 (2d Cir.1989).

■ A showing of irreparable harm is perhaps considered the single most important requirement in satisfying the standard. *See Reuters Ltd. v. United Press Int'l. Inc.*, 903 F.2d 904, 907 (2d Cir.1990) (recognizing that "irreparable harm is the single most important prerequisite for the issuance of a preliminary, injunction"). Essential to a showing of irreparable harm is the unavailability or at least inadequacy of a money damages award. *See, e.g., Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies"). Also, the applicant must establish more than a mere "possibility" of irreparable harm. Rather, he must show that irreparable harm is "likely" to occur. *See JSG Trading Corp.*, 917 F.2d at 79.

■ Finally, Fed.R.Civ.P. 52(a) requires that the district court sufficiently set forth its findings to permit appellate review. *See Society for Good Will to Retarded Children, Inc. v. Cuomo*, 902 F.2d 1085, 1088 (2d Cir. 1990), *Weitzman v. Stein*, 897 F.2d 653, 658 (2d Cir.1990). The Court will address each of these requirements in turn.

### 1. *Irreparable harm*

The plaintiff contends that if he is denied injunctive relief, he will suffer irreparable harm based on two separate arguments. Conceding that loss of employment is not, in and of itself, adequate to establish "irreparable harm," he nevertheless asserts that "the termination of his employment and hospital privileges will have a chilling effect on First Amendment rights." He also complains that nonrenewal of his faculty appointment will "cause irreparable harm to patients, plaintiff's practice, plaintiff's reputation, and his ability to practice his profession."

### (i) *The Alleged Chilling Effect on Shady's First Amendment Rights*

In two cases similar to the one before the Court, the Second Circuit reversed the district court's granting of preliminary injunctive relief. In *American Postal Workers Union v. United States Postal Service,* 766 F.2d 715 (2d Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1262, 89 L.Ed.2d 572 (1986), a postal workers union local president had written a letter to a major customer of the New London Connecticut Post Office, stating that recent personnel cuts at the post office had resulted in serious delays in mail delivery. The Postal Service conducted an investigation and found that the president's letter constituted "conduct prejudicial to the interest of the Postal Service," and thereafter informed the president—who was also a postal employee—that he would be fired in thirty days. The president and his union, in turn, moved for a preliminary injunction barring his discharge pending the outcome of a grievance procedure. The district court granted the injunction, holding that the potentially "chilling effect" on the First Amendment rights of the president and others in the union constituted irreparable harm sufficient to warrant injunctive relief.

On appeal, the Second Circuit reversed, finding that irreparable harm had not been shown. *American Postal Workers,* 766 F.2d at 722. The Court noted first that "[w]ith regard to irreparable harm, in *Sampson v. Murray,* 415 U.S. 61, 91–92, 94 S.Ct. 937, 953–54, 39 L.Ed.2d 166 (1974), the Supreme Court articulated a particularly stringent standard for irreparable injury in govern-

ment personnel cases.... According to the *Sampson Court,* except in a 'genuinely extraordinary situation,' irreparable harm is not shown in employee discharge cases simply by a showing of financial distress or difficulties in obtaining other employment." *American Postal Workers,* 766 F.2d at 721 (quoting *Sampson,* 415 U.S. at 92 n. 68, 94 S.Ct. at 953 n. 68).

Addressing the issue of the chilling of First Amendment rights, the Court observed that such chilling would constitute irreparable injury, and found that the president's letter implicated First Amendment rights because it addressed a matter of public concern. *Id.* at 721–22. Nevertheless, the Court held, "appellees herein have failed to allege a clear-cut infringement of First Amendment rights which, absent preliminary injunctive relief, either has occurred or will occur in the future." *Id.* at 722. The Court went on to say, "More importantly, we fail to understand how a chilling of the right to speak or associate could logically be thawed by the entry of an interim injunction, since the theoretical chilling of protected speech and union activities stems not from the interim discharge, but from the threat of permanent discharge, which is not vitiated by an interim injunction." *Id.*

The Second Circuit reaffirmed this holding in *Savage v. Gorski,* 850 F.2d 64 (2d Cir. 1988), where the Court reversed the district court's granting of a preliminary injunction that barred the discharge of public employees on the basis of their political beliefs. Citing and quoting *American Postal Workers,* the Second Circuit reiterated that

> Since the source of the 'chill' is the permanent loss of appellees' jobs, retaining those positions pending resolution of the case, will do nothing to abate that effect.... Since reinstatement and money damages could make appellees whole for any loss suffered during this period, their injury is plainly reparable and appellees have not demonstrated the type of harm entitling them to injunctive relief.

*Savage,* 850 F.2d at 67–68; *see also Rao v. New York Health and Hospitals Corp.,* 1990 WL 201662, 1990 U.S.Dist. LEXIS 16455

(S.D.N.Y. Dec. 6, 1990) (Leval, J.), *motion for reargument denied,* 1991 WL 64455, 1991 U.S.Dist. LEXIS 4865 (S.D.N.Y. April 12, 1991) (denying preliminary injunction in retaliatory discharge case alleging infringement of First Amendment rights, noting that "the Second Circuit has held that a preliminary injunction would not cure any irreparable harm.").

The holdings in *Savage* and *American Postal Workers* have equal force here. Given that "the source of any 'chill' on the First Amendment rights of either plaintiff or other . . . employees is the permanent loss of plaintiff's job, the interim injunctive relief plaintiff seeks in his instant motion will do nothing to thaw that chill." *Costello v. McEnery,* 767 F.Supp. 72, 75 (S.D.N.Y.1991), *aff'd,* 948 F.2d 1278 (2d Cir.), *cert. denied,* 504 U.S. 980, 112 S.Ct. 2957, 119 L.Ed.2d 579 (1992) (denying injunctive relief to employee who brought civil rights action alleging that he was transferred from one job to another in retaliation for public and private comments he had made regarding purportedly unethical and illegal practices of the city parking violations bureau, on ground that allegations of a chill against employee's First Amendment rights did not show irreparable harm necessary to entitle employee to preliminary injunction, particularly in light of one-year delay in bringing action).

Relying on *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Able v. United States,* 847 F.Supp. 1038 (E.D.N.Y. 1994), the plaintiff struggles to distinguish this case from *Savage* and *American Postal Workers* by arguing that those cases involved the indirect infringement of First Amendment rights, whereas here the plaintiff's right to freedom of speech is ongoing and direct. The Court disagrees. In *Elrod,* a three-justice plurality of the Supreme Court found irreparable harm where "[i]t [was] clear . . . that First Amendment interests were either threatened or in fact being impaired at the time relief was sought." *Elrod,* supra, 427 U.S. at 373, 96 S.Ct. at 2689. The *Elrod* Court held that the firing of public employees solely on the basis of their political affiliations violates the First Amendment and that "[t]he loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." In *Able,* gay and lesbian members of the armed forces challenged the constitutionality of the National Defense Authorization Act, which governs military service by homosexual service people. The United States District Court for the Eastern District of New York, 847 F.Supp. 1038, issued preliminary injunctions prohibiting investigation or initiation of proceedings against members based on their self-identification as gay or lesbian pending final determination of action. The plaintiff does not allege here, as did the plaintiffs in *Elrod* and *Able,* that he is being forced to choose between exercising his First Amendment rights and retaining his job. He already has lost his position and is free to speak on any subject he pleases. This is the key distinction between a retaliation claim of the sort asserted by Shady, and the First Amendment claims raised in *Elrod* and *Able:*

> [I]t is clear that the plaintiffs in *Am. Postal Workers Union* and *Savage,* as well as plaintiff herein, allege that termination occurred in retaliation for the exercise of the right to free speech. The distinction is important because on the one hand a person has lost his First Amendment right and has retained his employment. On the other hand a person has lost his employment but retained his First Amendment rights. Therefore, in the latter case, the damage is the loss of income, not the loss of First Amendment rights.

*Blum v. Schlegel,* 830 F.Supp. 712, 723 (W.D.N.Y.1993), *aff'd,* 18 F.3d 1005 (2d Cir. 1994) (former university law school professor who alleged that he had been terminated in retaliation for exercising his fight to free speech failed to establish irreparable injury that would warrant issuance of preliminary injunction in connection with his First Amendment claim).

■ "Finally, a related consideration is plaintiff's considerable delay in seeking injunctive relief. The Second Circuit has observed that '[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however,

tends to indicate at least a reduced need for such drastic, speedy action.... Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction.' ... The Second Circuit [has] further held that '[l]ack of diligence, standing alone, may ... preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm....' " *Costello,* 767 F.Supp. at 78 (citing in *Majorica, S.A. v. R.H. Macy & Co., Inc.,* 762 F.2d 7, 8 [2d Cir.1985]; *Borey v. National Union Fire Insurance Company of Pittsburgh,* 934 F.2d 30, 33–34 [2d Cir.1991] ). Here, the plaintiff was given one year advance notice of the non-renewal of his contract by letter dated March 21, 1997, and upon writing to Dr. Edelman, the plaintiff received an extension of his faculty appointment through April 15, 1998 (Shady Aff., at ¶ 35). The plaintiff did not move for injunctive relief until March 26, 1998, more than one year after learning of the adverse employment decision. "This delay in seeking relief bolsters the Court's conclusion that there has been an insufficient showing of irreparable harm to justify issuance of a preliminary injunction." *Costello,* 767 F.Supp. at 75.

In sum, the Court finds that this lawsuit is, at its core, a single plaintiff's claim for money damages. The plaintiff contends that he is entitled to his salary, position and benefits. If the plaintiff prevails in this case on the merits, he may be awarded his back pay and the value of any lost benefits or earnings. Accordingly, the Court finds that the plaintiff has not sufficiently established irreparable harm by virtue of this lawsuit which is based on an alleged deprivation of constitutional rights.

### (ii) Other Circumstances Constituting "Irreparable Harm"

■ The plaintiff argues, in the alternative, that nonrenewal of his faculty appointment will "cause irreparable harm to patients, plaintiff's practice, plaintiff's reputation, and his ability to practice his profession." The Court again disagrees.

■ With respect to the plaintiff's employment opportunities and professional reputation, absent "extraordinary circumstances," irreparable harm is not established by loss of income or position, or the inability to find other employment. *See Holt v. Continental Group, Inc.,* 708 F.2d 87, 90–91 (2d Cir.1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1294, 79 L.Ed.2d 695 (1984). In addition, in *Sampson v. Murray,* 415 U.S. at 91–92 and n. 68, 94 S.Ct. at 953 and n. 68, the Supreme Court held that, in general, damage to reputation "falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case." Irreparable injury along these lines can only be established by a clear demonstration that the plaintiff (1) has little chance of securing future employment; (2) has no personal or family resources; (3) has no private unemployment insurance; (4) is unable to finance a loan privately; (5) is ineligible for public assistance; and (6) there are no other compelling circumstances weighing heavily in favor of interim relief. *See Williams v. State Univ. of N.Y.,* 635 F.Supp. 1243, 1248 (E.D.N.Y.1986). "In essence, the plaintiff must quite literally find [himself] being forced into the streets or facing the spectre of bankruptcy before a court can enter a finding of irreparable harm." *Id.* at 1248.

Applying these standards, the Court finds that the plaintiff has not established such extraordinary circumstances. Shady is not precluded from seeking other employment once his termination comes to pass. Indeed, the plaintiff states that he already has full privileges at another hospital on the North Shore of Long Island, although it is not a "tertiary care facility like University Hospital." He concedes that he also has partial privileges at numerous other hospitals, and apparently will be free to seek full privileged status once his present position is terminated. In addition, the plaintiff does not allege that his unemployment would put a financial strain on his family resources, that he is on the verge of bankruptcy or that he is "being forced out into the street ." Significantly, he is a neurosurgeon, and with reasonable certainty, will continue to practice his learned profession with the usual monetary success.

Accordingly, the Court concludes that Shady has failed to establish the requisite "extraordinary circumstances," based on reputation and ability to practice, required to support a claim of irreparable harm.

### 2. *Likelihood of Success*

The second step of the inquiry requires that the movant demonstrate a likelihood of success on the merits. Before engaging in this analysis, the Court would ordinarily be required to determine whether the plaintiff is required to make an ordinary showing of likelihood of success. However, the Court need not undertake such an analysis. As stated above, the plaintiff clearly is unable to establish irreparable harm. Accordingly, he is not entitled to equitable relief no matter how likely his chances of success on the merits and his motion for a preliminary injunction is denied.

Finally, the Court observes that the plaintiff has expressed concern that the defendants will inhibit his pursuit of new employment by providing negative references. In addition, the plaintiff has accused the defendants of interfering with his scheduled interviews with prospective employers, and of "blacklisting" him within the professional community. Without making any findings as to these serious allegations, based on the record and the concessions made by the defendants as to the competency of the physician, the Court directs the defendants to not interfere, in any manner whatsoever, with the plaintiff's search for new employment, or with his applications for full or expanded privileges at any hospital. This includes, but is not limited to, not contacting any prospective employer or hospital to which Dr. Shady might seek full or expanded privileges unless asked to do so by the plaintiff for purposes of providing a reference. If contacted by a prospective employer or hospital for a reference, the defendants are directed to not comment negatively upon Shady's performance, in view of Tyson's concession that he evaluated Shady's technical skills as "above average," and considering that none of the defendants have questioned the plaintiff's competency as a neurosurgeon.

### III. CONCLUSION

After reviewing the parties' submissions, and hearing oral argument, and for the reasons set forth above, it is hereby

**ORDERED,** that the plaintiff's motion for a preliminary injunction pursuant to Fed. Civ.P. 65 is denied.

**SO ORDERED.**