[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The four plaintiffs in this action allege that their employment with the City of Waterbury ("City") was wrongfully terminated by the defendants effective December 31, 1991 in violation of their constitutional rights and state law. They further claim that they were improperly denied payment of accumulated sick leave upon their termination.
All four plaintiffs took non civil service positions in the mayor's office while Republican Joseph J. Santopietro was mayor. The plaintiff Arnold Pisciotti became Santopietro's director of operations, overseeing all of the day-to-day operations of the City. Plaintiff James Quinn became the budget director, with the responsibility to prepare the City budget as directed by the mayor. Plaintiff Debra Guertin served as executive secretary to the mayor. Plaintiff Barbara Rodriguez began as a receptionist in the mayor's office and then approximately one year later became a secretary in the mayor's office. In November, 1991, Democrat Edward D. Bergin was elected mayor, defeating the incumbent, Santopietro. During December 1991, all four plaintiffs were notified that their City employment would end on December 31, 1991 because Bergin would take office January 1, 1992.
The plaintiffs allege that the termination of their employment deprives them of their constitutional right to freedom CT Page 3166 of speech, freedom of belief and freedom of association in that they lost their jobs because they were Republicans at a time when a Democratic administration was coming into office. The defendants do not dispute the factual reason for the termination of the plaintiffs' employment. They do dispute whether the termination is actionable.
In 1976 the U.S. Supreme Court found that patronage dismissals infringe employees' constitutional rights to freedom of political belief and association and therefore must be restricted. Elrod v. Burns, 427 U.S. 347 (1976). The restriction approved by the court was to limit the dismissals to employees who hold confidential or policymaking positions. Id., 372. Employees without policymaking responsibility, said the court, may not be discharged because of their political beliefs.
Four years later, the Supreme Court revisited its ruling inElrod. The plaintiffs in Branti v. Finkel,445 U.S. 507 (1980), were assistant public defenders who were registered Republicans. The new chief public defender, a registered Democrat, sought to discharge the plaintiffs because they were Republicans. The Supreme Court further defined the policymaking distinction established in Elrod. "In sum, the ultimate inquiry is not whether the label `policy maker' or `confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Id., 518. The Supreme Court upheld the trial court and found that party affiliation was not an appropriate requirement for the effective performance of a public defender, whose job is to represent indigent citizens in controversies with the state. Id.
The Second Circuit Court of Appeals has interpreted the test in Branti as establishing that "political affiliation is an appropriate requirement when there is a rational connection between shared ideology and job performance, a reading which would exempt from protection most policymaking and confidential employees . . ." Savage v. Gorski, 850 F.2d 64, 68 (2d Cir. 1988). The Second Circuit recently reaffirmed this test, stating "[i]t is necessary to scrutinize the functions of the position to determine whether there is that connection," i.e., between shared ideology and job performance. Regan v. Booqertman, 984 F.2d 577,580 (2d Cir. 1993). The Court of Appeals also set forth several factors to be considered in making that determination: whether CT Page 3167 the position enjoys civil service protection, whether the position has policymaking and independent decision making functions by law, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials and responsiveness to partisan politics and political leaders. Id.
Applying these factors to the functions of the plaintiffs' positions in the mayor's office demonstrates that there is in this case a rational connection between shared ideology and job performance with respect to all four positions. None of the positions held by the plaintiffs enjoys civil service protection, the first factor. A further analysis of the functions of each plaintiff's individual position establishes the importance of having shared ideology with the mayor.
As director of operations, the plaintiff Arnold Pisciotti, a longtime registered Republican whose brother was close to the mayor, had the responsibility of managing all City departments. His function each day was to do "whatever work had to be done during the course of the day that the mayor would want to have done." In doing so, he implemented the mayor's policies. The mayor was his direct supervisor. Pisciotti had contact with and responded to elected and appointed officials of the City and members of the public. Clearly, he had the power to control others; he spoke with the authority of the mayor; and he influenced programs in that it was his responsibility to review requests from all city departments and make recommendations to the mayor with respect to these requests.
James Quinn, the treasurer of the Prospect Republican Town Committee, held the position of budget director and was responsible for the preparation and implementation of the budget as directed by the mayor. He presented the budget to the board of finance, the board of aldermen and City department heads, obtained information from them and presented that information to the mayor. He was the mayor's chief support staff for research and analysis with respect to the budget. Quinn clearly had the authority to speak in the name of the mayor; he was perceived as speaking for the mayor; he influenced programs through the budget and had contact with elected officials such as members of the board of aldermen.
Deborah Guertin and Barbara Rodriguez were secretaries in the mayor's office. Both of them had job interviews with Pisciotti CT Page 3168 and were hired by him to work for the mayor. They both performed normal secretarial duties such as typing, filing, answering the phones, taking messages and placing calls for the mayor. Both handled correspondence and complaints from constituents. In addition, as executive secretary to the mayor, Guertin kept the mayor's official calendar, opened the mail for the office and distributed it as directed by him after they discussed it. Both Guertin and Rodriguez had contact with public and elected officials and media representatives. They both registered as Republicans after taking their jobs with the mayor and both worked on his subsequent re-election campaigns. Shared ideology was important in their jobs because of their contact with elected officials, their ability to speak with the authority of the mayor when handling constituent complaints and their responsibility to make appointments for the mayor and transmit messages to him.
Loyalty, confidence and trust between the mayor and the secretaries was important. As the U.S. Court of Appeals for the Sixth Circuit has found, "the duties of a mayor's secretary are inherently political . . ." Faughender v. City of NorthOlmstead. Ohio, 927 F.2d 909, 913 (6th Cir. 1991). The Second Circuit and Seventh Circuit have also found that secretaries to policymakers may be terminated because of political affiliation.Savage v. Gorski, supra, 850 F.2d 69; Soderbeck v. BurnettCounty, Wisconsin, 752 F.2d 285, 288 (7th Cir. 1985), cert. denied 471 U.S. 1117 (1985).
All four plaintiffs held positions for which party affiliation was an appropriate requirement because there is a rational connection between shared political ideology and the effective performance of each of these four positions. Therefore, the plaintiffs cannot succeed on their claim of a violation of their constitutional rights in connection with their discharge from City employment.
The plaintiffs' second claim is made under General Statutes § 31-51q, which provides in pertinent part:
Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere withCT Page 3169 the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge . . .
(Emphasis added.) Our Appellate Court has summarized the scope of the statute, stating that it prohibits "the discharge of an employee who exercises those rights that are guaranteed by particular sections of the state and federal constitutions, provided that the exercise of those rights does not interfere with the employee's bona fide job performance or the working relationship between the employee and the employer." Cotto v. United Technologies Corp.,48 Conn. App. 618, 625 (1998).
A plaintiff who brings a claim under General Statutes §31-51q must allege and prove that the exercise of his or her constitutional rights does not materially interfere with his or her job performance or the working relationship between the employee and employer. Taylor v. Grote Weigel,, Inc., Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV96-0563464 (March 6, 1998); Sherman v. SedgwickJames of Connecticut, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 326150 (February 10, 1997). All four plaintiffs testified that they wished to retain their respective positions with the mayor's office despite the change im administrations and that they felt they could work well with incoming Mayor Bergin. The court did not find credible the plaintiffs' testimony that they could work well in the Bergin administration.
Bergin was mayor of the City from 1976 until 1985, when Santopietro was elected mayor. Bergin returned to office on January 1, 1992, after defeating Santopietro in the 1991 election. Bergin testified that the mayor's staff in the City is small and loyalty to the administration is important. Citing a specific example, he pointed out that there are many issues of a confidential nature handled in the mayor's office, leading to a need for trust and confidence between the mayor and his staff. Bergin further pointed out that Santopietro and others in his administration had been indicted for municipal corruption. Bergin therefore was particularly wary of others with responsible positions in the Santopietro administration because of the possibility of further criminal involvement. As Democratic mayor-elect, he instructed that the plaintiffs, Republican loyalists, be discharged from their positions effective December 31, 1991. CT Page 3170
The court found Bergin's testimony credible and persuasive. The court finds that the plaintiffs failed to satisfy their burden of proving that the exercise of their constitutional right to be registered and active Republicans would not materially interfere with their working relationship with Democratic Mayor Bergin. The court therefore finds for the defendants on the plaintiffs' second claim.
The plaintiffs' third claim is that they were wrongfully discharged under Connecticut common law. The general rule in Connecticut is that contracts for an indefinite term are terminable at will. Coelho v. Posi-Seal International, Inc.,208 Conn. 106, 118 (1988). The doctrine of wrongful discharge, a narrow exception to the general rule, holds that an employer may be liable for discharging an at-will employee "if the former employee can prove a demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." Sheets v. Teddy's Frosted Foods,Inc., 179 Conn. 471, 475 (1980). "Under the exception, the employee has the burden of pleading and proving that his dismissal occurred for a reason violating public policy." Morrisv. Hartford Courant Co., 200 Conn. 676, 679 (1986). A claim for wrongful discharge must allege a violation of some judicially conceived notion of public policy or an explicit statutory or constitutional provision. Id., 680.
In their post-trial memorandum of law, the plaintiffs briefed their wrongful discharge claim together with their claim under General Statutes § 31-51q, suggesting that the alleged violation of that statute is the basis for their common law wrongful discharge claim. The court has found, however, that the discharge of the plaintiffs was not in violation of Section 31-51q. The court has also found that their discharge was not a violation of their rights as established in the United States Constitution. The plaintiffs have not cited and briefed any other statute or constitutional provision or any other public policy that was contravened by their discharge. The court therefore finds for the defendants on the plaintiffs' wrongful discharge claim because of their failure to establish that their discharge was in violation of a statute, a constitutional provision or public policy.
The plaintiffs' final claim is that at the time of their discharge they were denied compensation for unused sick leave in CT Page 3171 violation of General Statutes § 31-76k, which provides in pertinent part, "[i]f an employer policy . . . provides for the payment of accrued fringe benefits upon termination . . . such employee shall be compensated or such accrued fringe benefits . . ." While employed by the City, each of the plaintiffs received a document entitled "Mayor's Office Personnel Policies and Procedures Effective Date: January 1, 1986," which was issued by Santopietro. It states, "[U]pon termination of service, employees will be paid, as terminal pay, the equivalent of one hundred percent (100%) of accumulated sick leave up to 180 days valued at the pay rates in existence at time of termination." The Bergin administration refused to honor Santopietro's policy, relying on an opinion from the corporation counsel that the City lacked the authority to pay accumulated sick leave in accordance with that policy.
Our courts have long noted the distinction between private and public entities when determining the existence of contractual rights and obligations. Pineman v. Oechslin, 195 Conn. 405, 415
(1985). "Courts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis for a contract . . ." (Citation omitted; internal quotation marks omitted.) Id.
"[A] city's charter is the fountainhead of municipal powers . . . Agents of a city have no source of authority beyond the charter . . ." (Citation omitted; internal quotation marks omitted.) Fennell v. Hartford, 238 Conn. 809, 813 (1996). The plaintiffs in Fennell were retired police officers seeking damages for the city's failure to pay certain retirement benefits. They claimed breach of an implied contract based on certain statements contained in a pension manual issued by the city pension commission. Our Supreme Court held that implied contract principles could not be applied to representations in the pension manual because the pension commission did not have the legal authority to confer additional pension benefits through the manual. Id., 816-17. Under the city charter, said the court, the city council had the sole authority to confer pension benefits and the manual would have to be ratified by the city council in order to bind the city. Id. Without ratification, the court ruled, the manual could not serve as the basis for the plaintiffs' implied contract claim.
The same reasoning applies to the plaintiffs' claims, which CT Page 3172 are based on the personnel policy issued by Santopietro. General Statutes § 7-460 authorizes the legislative body of a municipality to "fix the compensation of its officials and employees, subject to the approval of the budget authority." The legislative body for the City is the board of aldermen. Waterbury Charter § 301. Section 1502 of the Waterbury Charter prohibits the expenditure of City funds except as appropriated by the board of aldermen in accordance with the Charter. In preparing the budget, the board of finance initially sets the compensation of municipal officials and employees "subject to the approval of the board of aldermen as the budget authority." Waterbury Charter § 126.
It is undisputed that Santopietro did not obtain the prior approval of the board of finance or board of aldermen for his proposal to pay accumulated sick leave as terminal pay to mayor's office employees. Nor did he obtain ratification of his proposal by both boards after he issued his policy. He did not have any authority under the Waterbury Charter to issue a personnel policy for the employees of the mayor's office that would be binding on the City without such prior approval or subsequent ratification. A valid contract cannot be created unless the officer or board with the authority to do so acts on behalf of the municipality.Fennell v. Hartford, supra, 238 Conn. 813. The plaintiffs' final claim is therefore without merit.
Judgment is entered for the defendants with costs.
Vertereuille, J.