**Martin CAMACHO, Plaintiff–Appellee,**

**v.**

**Symra D. BRANDON and City of Yonkers, New York, Defendants–Appellants,**

**Gordon Burrows, Individually and John Spencer, Individually, Defendants.**

**Docket No. 01–9117.**

United States Court of Appeals, Second Circuit.

Argued: June 10, 2002.

Decided: Jan. 10, 2003.

Kim Berg, Lovett & Gould, Esqs., White Plains, NY, for Plaintiff–Appellee.

Robert David Goodstein, Goodstein & West, New Rochelle, NY (Eileen West, of counsel, Goodstein & West, New Rochelle, NY), for Defendant–Appellant Symra D. Brandon.

Ching Wah Chin, Senior Associate Corporation Counsel, Yonkers, New York (William M. Mooney, Corporation Counsel, Yonkers, NY), for Defendant–Appellant City of Yonkers.

Before: WALKER, Chief Judge, and MINER and CABRANES, Circuit Judges.

Chief Judge JOHN M. WALKER, Jr., concurs in a separate opinion.

MINER, Circuit Judge.

Defendant-appellant Symra D. Brandon, a Yonkers City Council member and Minority Leader ("Minority Leader Brandon"), and defendant-appellant City of Yonkers (collectively, "Defendants") appeal from a judgment for money damages entered in the United States District Court for the Southern District of New York (Conner, *J.*), following a jury trial, in favor of plaintiff-appellee Martin Camacho. The jury found by special verdict that Defendants violated the First Amendment by terminating Camacho's employment in retaliation for the vote cast by another City Council member, Fernando Fuentes, against a capital budget initiative supported by Minority Leader Brandon and her political allies.

In this case, we are asked to decide whether Camacho, an employee of the City Council and a legislative aide to City Council member Fuentes, may maintain a federal civil rights action brought pursuant to 42 U.S.C. § 1983 against Defendants for firing him in retaliation for a vote by Fuentes. The vote was against a legislative proposal sponsored by a majority coalition of the City Council that was formed for the purpose of supporting the Mayor's legislative initiatives. For the reasons set forth below, we conclude that such an action cannot lie, given both (1) Fuentes' status as a policymaker, and (2) the termination of Camacho on the basis of Fuentes'

vote as well as Fuentes' decision to affiliate himself with the "Minority Coalition" of the City Council instead of with the "Majority Coalition" of the City Council.

For the reasons that follow, we reverse and remand to the District Court with instructions to enter judgment for Defendants.

## BACKGROUND

### I. *Yonkers City Government*

The City of Yonkers is governed by a seven-member city council and a mayor. Charter of the City of Yonkers § C2–1. The City Council is composed of a City Council President, who is elected citywide, and six City Council members, one elected from each of the city's six City Council districts. *Id.* Each City Council member, including the City Council President, serves a two-year term beginning on January 1 of the year following his or her election. *Id.* § C2–2. The City Council is vested with "[a]ll of the legislative powers of the city" and is empowered to adopt most legislation by a simple majority vote. *Id.* §§ C4–1(A), C4–6(B). The City Charter established three offices within the City Council: the Office of the City Council President, the Majority Leader's Office, and the Minority Leader's Office. *Id.* §§ C4–13(A)–(C).[1] The City Council Majority and Minority Leaders have the power to "supervise, hire and fire all employ-

ees in [his or her] office." *Id.* § C4–13(B), (C).

The chief executive of the City of Yonkers is a Mayor, who is elected citywide to a four-year term commencing on January 1 of the year following his or her election. *Id.* §§ C2–2(A), C3–1, C3–2. The Mayor has the power to veto bills adopted by the City Council, and a veto will stand unless two-thirds of the membership of the City Council votes to override it. *Id.* §§ C3–2(13), C4–6(B). In addition, the Mayor is required to submit a proposed budget for the coming fiscal year to the City Council no later than April 15 of each year. *Id.* §§ C3–2(8), C5–2. It is undisputed that the City Charter requires votes of at least two-thirds of the seven City Council members (i.e., five members) to approve the Mayor's proposed capital budget.

During calendar year 1998, the Mayor of Yonkers was defendant John Spencer,[2] a Republican. The Republican City Council members were City Council President Vincent Restiano, defendant Majority Leader Gordon Burrows,[3] Council member Richard Martinelli, and Council member Carlo Calvi. The Democrat members were Minority Leader Brandon, Council member Fernando Fuentes, and Council member Jeff Balancio.[4] Thus, there were four Republicans and three Democrats. The City Council did not always organize itself along party lines, however. Instead, the council members often formed political alliances known as "coalitions" to advance

---

**1.** As explained in more detail below, the terms "Majority Leader" and "Minority Leader" refer to leaders of the Republican and Democratic Party members on the City Council and not to leaders of the legislative coalitions that were formed from time to time by City Council members. As will be seen, the legislative coalitions were not always formed on the basis of political party affiliation.

**2.** Prior to trial, Mayor Spencer was dismissed from the case with prejudice pursuant to a

stipulation and order entered in the District Court.

**3.** Majority Leader Burrows was dismissed from the case before it was submitted to the jury.

**4.** Some time in early 1998, Balancio switched party affiliation from Republican to Democrat.

their public policy agendas. In January 1998, an attempt was made by Majority Leader Burrows, Minority Leader Brandon, Fuentes, Balancio and Calvi to form a governing coalition. This attempt proved unsuccessful, however, in part due to a disagreement over who should serve as Majority Leader. Minority Leader Brandon and Majority Leader Burrows supported the latter to continue in the position, whereas the other three legislators supported Calvi. Shortly thereafter, with encouragement from Mayor Spencer, Majority Leader Burrows and Minority Leader Brandon joined Council President Restiano and Council member Martinelli to form a new governing coalition. This coalition came to be referred to as the "Majority Coalition," while the group comprised of Fuentes, Calvi, and Balancio came to be referred to as the "Minority Coalition."

## II. *Events Leading Up to Camacho's Termination*

To understand the events giving rise to the termination of Camacho's employment, it is necessary to examine the political machinations taking place in the Yonkers City Council during the first half of 1998. When the newly elected City Council began its legislative session in January 1998, Camacho was a Senior Legislative Aide in the City Council Minority Leader's Office. He had been hired by Minority Leader Brandon, pursuant to her hiring authority, on the basis of Fuentes' recommendation and was assigned by her to Fuentes at the latter's request. Camacho had been closely associated with Fuentes since Camacho came to the United States in 1981. Camacho had worked on all of Fuentes' political campaigns from 1986 until Fuentes left the area in 1999, serving in various capacities, including treasurer, consultant, and eventually campaign manager. Indeed, Camacho was the best man at Fuentes' wedding.

In serving as Fuentes' legislative aide, Camacho was intimately involved with all the functions of Fuentes' office, including answering the telephones, constituent service, and developing legislative policies. Indeed, Camacho was the only legislative aide who attended and participated in Minority Coalition caucus meetings where strategies were devised for responding to policy initiatives made by the Mayor and backed by the Majority Coalition.

During the period January 1998 until at least the date when Camacho was fired, the Majority Coalition maintained a strong political alliance with Mayor Spencer. Thus, the Majority Coalition always supported Mayor Spencer's legislative proposals without modification, while the Minority Coalition generally opposed those proposals. With rare exceptions, the Minority Coalition voted together as a block of three. Consequently, almost all City Council votes were four to three in favor of the Mayor's policies.

As time went on, relationships between these two political factions deteriorated. Majority Leader Burrows accused the members of the Minority Coalition of being obstructionists for opposing virtually all of the Mayor's policy initiatives. Burrows even lobbied Camacho to persuade Fuentes to end his affiliation with the Minority Coalition. Indeed, Camacho testified at trial that, in February 1998, he had a conversation with Burrows during which Burrows told him that the Mayor, as well as the members of the Majority Coalition, wanted Camacho to be fired because they were not "happy" about the fact that Fuentes "was associating himself with Carlo Calvi." According to Camacho, Burrows was "saddened that [Fuentes] was aligning himself with Calvi," who the Mayor and his political allies considered "to be evil, and they considered him to be the enemy; and they didn't like this fact that

[Fuentes] was aligning himself" with the Minority Coalition. Burrows intimated that Fuentes' political affiliation might "affect" Camacho by "put[ting] [his] job in jeopardy."

By the time the City Council scheduled a vote on the Mayor's proposed capital budget in June 1998, the Majority Coalition was unable to muster the votes necessary to adopt the Mayor's proposal. As noted above, approval of the capital budget required five votes. The Mayor's allies on the Majority Coalition could—and did—provide four of those five needed votes. The Minority Coalition, however, once again voted as a block against the budget, which failed to pass by a "coalition-line" vote of four to three. Representatives of both coalitions read the vote as yet another successful attempt by the Minority Coalition to flex its political muscle. According to Majority Leader Burrows, "[b]y reason of the [M]inority [C]oalition voting as a group, they were able to defeat the capital budget that year." Fuentes agreed, testifying that "we had to vote down the total project," and explained that "we" referred to the Minority Coalition.

The Majority Coalition responded quickly. The day after the capital budget was defeated, Camacho was terminated in a letter handed to him by Minority Leader Brandon, and Fuentes lost his trusted and loyal legislative aide. Fuentes and Camacho were not the only victims of the Majority Coalition's ire, however. Shortly after Camacho was terminated, Calvi also lost his legislative aide, and the office desks belonging to Calvi and Balancio were relocated to less desirable places in the City Council office area.

### III. *Proceedings Below*

In July 1998, Camacho filed a complaint against the City of Yonkers, Minority Leader Brandon, Majority Leader Burrows, and Mayor Spencer (the latter three in their individual capacities), in which he alleged: (1) deprivation of his First Amendment rights, in violation of 42 U.S.C. § 1983; (2) deprivation of his Fourteenth Amendment right to equal protection, in violation of 42 U.S.C. § 1983; (3) impairment of his right to make and enforce contracts as guaranteed by 42 U.S.C. § 1981; and (4) unlawful termination to be remedied in accordance with Article 78 of the New York State Civil Practice Law and Rules. In July 1999, the District Court partially granted summary judgment for Defendants, dismissing all but the First Amendment claim. *See Camacho v. Brandon,* 56 F.Supp.2d 370, 373 (S.D.N.Y.) (*"Camacho I"*), *reconsideration denied,* 69 F.Supp.2d 546 (S.D.N.Y.1999). In particular, the District Court found that Camacho had third-party standing to sue Defendants for violating Fuentes' First Amendment rights.[5] The District Court rejected the motion to dismiss Camacho's third-party First Amendment claim as a matter of law and ruled that the individual defendants were not entitled to qualified immunity. The District Court found unpersuasive Defendants' argument that Camacho's status as a policymaker permitted them to retaliate against Camacho for exercising his First Amendment rights. *Id.* at 376. The District Court reasoned that, because Camacho was claiming that Defendants fired him in retaliation for Fuentes' exercise of Fuentes' First Amendment rights, any argument relying on Camacho's

---

**5.** By the time the summary judgment order was entered, Camacho had abandoned the allegation in his complaint that he had been fired in retaliation for exercising his own First Amendment rights and had conformed his claim to the theory that he had been fired in retaliation for Fuentes' exercise of Fuentes' First Amendment rights. *See Camacho I,* 56 F.Supp.2d at 374. He has never wavered from that position.

status as a policymaker was "wholly super-fluous." *Id.* Defendants' interlocutory appeal from the portion of the summary judgment order rejecting their claims of qualified immunity was dismissed by this Court as untimely filed. *See Camacho v. City of Yonkers*, 236 F.3d 112 (2d Cir.2000) ("*Camacho II* ").

In September 2001, a six-day trial began on Camacho's remaining claim of termination in violation of Fuentes' First Amendment rights. Camacho continued to insist that he was fired in retaliation for Fuentes' vote against the capital budget and affiliation with the Minority Coalition rather than the Majority Coalition. Defendants moved for a directed verdict at the close of Camacho's case, and their motion was denied by the District Court. On September 14, 2001, the jury returned a special verdict in favor of Camacho in which it found that Camacho had proven by a preponderance of the evidence that Fuentes' vote against the capital budget "was a substantial or motivating factor" in Minority Leader Brandon's decision to "terminate his employment as a senior aide to the Yonkers City Council . . . ." The jury awarded Camacho $46,500 in compensatory damages and $5,000 in punitive damages. Immediately after the jury announced its verdict, Defendants moved for judgment notwithstanding the verdict, and that motion was denied by the District Court. Judgment was entered in favor of Camacho on September 27, 2001. This timely appeal followed.

## DISCUSSION

On appeal, Defendants argue that the District Court: (1) erred in finding that Camacho had third-party standing to sue them for allegedly violating Fuentes' First Amendment rights; (2) erred in not finding as a matter of law that Camacho was a policymaker who could be fired without the benefit of First Amendment protections; and (3) abused its discretion in failing to admit certain evidence offered by them. As we explain below, we need only address the first two of these three arguments.

## I. *Camacho's Standing to Assert Fuentes' First Amendment Rights*

■■■ Defendants' argument that Camacho lacks third-party standing to assert Fuentes' First Amendment claims need not detain us long. A plaintiff may assert the constitutional claims of a third party if the plaintiff can demonstrate: (1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) "some hindrance to the third party's ability to protect his or her own interests." *Campbell v. Louisiana*, 523 U.S. 392, 397, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998). Here, it cannot be gainsaid that Camacho satisfies all three of these elements. First, in awarding Camacho $46,500 in compensatory damages, the jury found that Camacho was injured when he was fired, and Defendants do not challenge that factual finding on appeal. Second, as noted above, Camacho and Fuentes maintained a very close professional and personal relationship. For example, Camacho worked on Fuentes' political campaigns from 1986 to 1999. When Camacho was hired to work for the City Council, it was at Fuentes' specific request for Camacho to work as his aide. Moreover, Defendants' testimony established that Fuentes' affiliation with the Minority Coalition and his vote against the budget proposal were closely related to Camacho's continued employment. Before Camacho's termination, Defendants warned Camacho that his job was in jeopardy if Fuentes continued to position himself with the Minority Coalition against Defendants' proposals. As

the vote on the budget proposal drew near, Minority Leader Brandon communicated the implied threat that, if Fuentes voted against the proposal, she would retaliate against Fuentes by firing Camacho. Then, only twelve hours after Fuentes voted against the proposal, Minority Leader Brandon terminated Camacho, telling him that he had Fuentes to thank for his termination. There is ample evidence to conclude that Camacho had a close working relationship with Fuentes and that Defendants linked Camacho's continued employment with Fuentes' political affiliation and vote. Accordingly, Camacho is in a good position to be an effective proponent of Fuentes' asserted rights.

Finally, Fuentes may be hindered in vindicating his own alleged rights. Fuentes clearly suffered injury in fact based on the firing of his trusted aide. In addition, Fuentes may be more likely to cast his votes in favor of Majority Coalition positions out of fear of future retaliation. Fuentes is inhibited from seeking redress for these injuries because of the absence of any direct economic harm to him from Camacho's firing, see Camacho I, 69 F.Supp.2d at 551 n. 5, and the possibility that instituting litigation on his own behalf may only incur further retribution. Accordingly, we reject Defendants' argument that Camacho lacks third-party standing to assert whatever First Amendment claims Fuentes may have.

## II. *Fuentes' First Amendment Rights*

■ To prevail on a First Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff must prove by a preponderance of the evidence that (1) the expression at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected his constitutionally protected expression, and (3) a causal relationship existed between the constitutionally protected expression and the retaliatory action. *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled in part on other grounds by, Phelps v. Kapnolas,* 308 F.3d 180, 187 n. 6 (2d Cir.2002). As the District Court noted in *Camacho I,* Camacho's claim "raises a somewhat complex legal issue." 56 F.Supp.2d at 374. Camacho is not claiming that he was fired from his position as a public employee in retaliation for exercising his own First Amendment freedoms. Nor is he claiming that he was fired because of his affiliation or association with a particular political party. Rather, he claims that he was fired in retaliation for Fuentes' activities. Thus, his claim must succeed or fail based on whether Fuentes' activities enjoyed the protection of the First Amendment.

■ Voting on public policy matters coming before a legislative body is an exercise of expression long protected by the First Amendment. *See, e.g., Colson v. Grohman,* 174 F.3d 498, 506 (5th Cir.1999). As the Supreme Court observed in *Bond v. Floyd,* 385 U.S. 116, 135–36, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966), "[t]he manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy."

■ In addition, affiliating oneself with a political party or faction is also protected by the First Amendment. As the Supreme Court's explained in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), political affiliations of low-level political players are constitutionally protected from government retaliation, whereas political affiliations of "policymakers"

are not similarly protected.[6] Courts that have examined First Amendment retaliation claims made by publicly elected officials against other publicly elected officials on the basis of political affiliation have thus found no First Amendment violation when the plaintiff was a policymaker. For example, in *Romero–Barcelo v. Hernandez–Agosto*, 75 F.3d 23, 34 (1st Cir.1996), the former governor of Puerto Rico, having just lost his bid for reelection, brought a Section 1983 action against elected members of the Puerto Rico Senate from the opposing political party, alleging that they violated his First Amendment right of association with his own political party by "rigging" legislative hearings to make it appear that he was involved in illegal activity, thereby costing him the election. The First Circuit held that the former governor "most assuredly qualified as [a] policymaker" and affirmed the district court's finding that there was "no First Amendment protection for a politician whose rights to freedom of speech, freedom of association, and freedom to disassociate [oneself] from unpopular views have been injured by other politicians seeking to undermine his credibility within his own party and with the electorate." *Id.* (internal quotations omitted). Indeed, this conclusion is sensible because, if the court had allowed the lawsuit to go forward, it would have subjected to judicial review all sorts of politically motivated conduct committed within the confines of legislatures and best left within the legislative sphere.

■ Finally, in the context of government retaliation against nonelected public employees for exercising their First Amendment rights, the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), established a balancing test for determining whether an employee's First Amendment rights were violated. A court applying the *Pickering* balancing test must determine whether the employee's right to express himself is outweighed by the government's interest in the effective operation of the workplace. In particular, a court must assess the extent of the disruption caused by the speech on workplace discipline, harmony among coworkers, working relationships, and the employee's job performance, and then determine whether the disruption justifies the government's stifling of the protected expression. *Id.* at 569–73, 88 S.Ct. 1731.

■ In First Amendment retaliation cases in which the government's retaliation is motivated by both expression protected under *Pickering* and political association unprotected under *Elrod,* our Court held in *McEvoy v. Spencer*, 124 F.3d 92 (2d Cir.1997), that there generally is no First Amendment violation when the plaintiff is a policymaker. We interpreted the *Pickering* line of Supreme Court cases as holding that the policymaking status of a plaintiff was "very significant in the *Pickering* balance, but not conclusive." *Id.* at 103. Thus, while a plaintiff's policymaking role does not provide a defendant "with complete insulation" for any retaliatory action, it does "weigh, normally heavily," on the defendant's side in the *Pickering* balance. *Id.; see also id.* at 102 (plaintiff's status as policymaker "plays a significant but not dispositive role in *Pickering* balance").

---

**6.** Our Court has defined "policymaker" as someone for whom "political affiliation is an appropriate requirement when there is a rational connection between shared ideology and job performance," *Savage v. Gorski*, 850 F.2d 64, 68 (2d Cir.1988), and as a person occupying a position calling for political loyalty, *Regan v. Boogertman,* 984 F.2d 577, 580 (2d Cir.1993).

■ Given all of the above, Camacho's claim as finally presented was insufficient as a matter of law. First, the uncontroverted evidence presented at trial established that Fuentes—in his capacity as a City Council member—was a quintessential policymaker. As elected officials, council members are exempt from civil service protection. N.Y. Civ. Serv. Law § 35(a) (McKinney 1999). They control others, such as Camacho. They are perceived as policymakers by members of the public. Their votes influence government programs. They have contact with other elected officials on the City Council. And they are responsive to partisan politics and political leaders. *See Vezzetti v. Pellegrini,* 22 F.3d 483, 486 (2d Cir.1994). Indeed, in its charge to the jury, the District Court stated that City Council members—and Fuentes in particular—"were policy makers for the City of Yonkers." [7] Thus, because he was a policymaker, Fuentes' First Amendment claim could not succeed if Defendants retaliated against him for his political associations as well as his votes. To be sure, as a publicly elected official, Fuentes does not represent the typical *Elrod/Branti* plaintiff. But the policy rationales articulated in those decisions permitting a government employer to punish an unelected employee based on his political affiliations are equally applicable—if not stronger—where an individual or entity exercising governmental powers seeks to retaliate against a publicly elected official based on the latter's votes and political affiliations. This is especially so when that retaliation takes the form of separating the official from an aide with whom he had a close working relationship in the policy-making process.[8] Indeed, to hold otherwise would subject to litigation all manners and degrees of politically motivated, retaliatory conduct directed at public officials.[9]

Second, the evidence introduced at trial, when viewed in a light most favorable to Camacho's theory of the case,[10] established that Defendants retaliated against Fuentes and the other Minority Coalition members based on their votes against the capital budget as well as on their decision to associate themselves with the Minority Coalition instead of with the Majority Coalition. Indeed, according to Camacho's unrebutted testimony, Majority Leader

7. That Fuentes was a policymaking official was never disputed by the parties.

8. Retaliation against legislators through the firing of staff members by those in legislative leadership positions is not limited to the Yonkers City Council. It has been known to occur in such august bodies as the United States Senate. *See* Robert A. Caro, *The Years of Lyndon Johnson: Master of the Senate* 565–66 (2002).

9. We need not posit, as Chief Judge Walker does, the case in which a legislator has been altogether barred from Council meetings in retaliation for his political associations. We are not presented with a case remotely like that. This case involves the termination of a staffer by the Council's Minority Leader in retaliation for a fellow legislator's political affiliation and vote. No First Amendment right is implicated under these circumstances.

10. To be sure, Defendants presented evidence in an attempt to persuade the jury that Camacho was terminated not because Defendants were retaliating against Fuentes but because of reasons relating to Camacho's competence and character. In concluding that Camacho's claim fails as a matter of law based on Fuentes' vote on the budget and Fuentes' affiliation with one political coalition instead of another, we have reviewed the record in the light most favorable to Camacho's theory of the case and consistent with the jury's special verdict findings. *See Doctor's Assocs., Inc. v. Weible,* 92 F.3d 108, 111–12 (2d Cir.1996) (in deciding whether to grant judgment notwithstanding the verdict, court must view evidence "in light most favorable" to party against whom judgment is to be entered without considering the credibility or weight of the evidence).

Burrows informed him four months before he was terminated that his job security would be in danger if Fuentes remained in the Minority Coalition and allied with Calvi. Accordingly, because the actions taken by Defendants were in retaliation for both political affiliation unprotected by virtue of the "policymaker" exception promulgated in *Elrod/Branti* (associating with the Minority Coalition instead of the Majority Coalition) and expression that would otherwise have been protected under *Pickering* (voting against the capital budget), Defendants, as a matter of law, are not liable for violating Fuentes' First Amendment rights.[11]

We recognize that in reaching the conclusion that Camacho's claims as ultimately presented are legally insufficient to support a verdict in his favor, we are applying legal principles in a manner somewhat different from the manner in which Defendants have asked us to apply them. Both on appeal and in the District Court, Defendants focused on Camacho's political affiliations and status as a policymaker and the legal implications of that status, rather than on Fuentes' status as a policymaker and on what role, if any, Fuentes' political affiliations played in Defendants' termination of Camacho. In their motion for judgment notwithstanding the verdict, Defendants argued that Camacho "was a confidential secretary and as a matter of law, he is not allowed First Amendment protections." The District Court compounded

this erroneous characterization by: (1) formulating the policymaker question in terms of whether Camacho, rather than Fuentes, was a policymaker; (2) submitting the case to the jury with instructions to find in favor of Camacho if it determined that "Fuentes' exercise of his right to vote was a substantial or motivating factor in the [D]efendants' determination to terminate his employment"; and (3) having instructed the jury that Fuentes was a policymaker, then failing to instruct the jury that it must find for Defendants if it was established by a preponderance of the evidence that Defendants' firing of Camacho was carried out in retaliation for Fuentes' vote on the capital budget and his political association with the Minority Coalition instead of the Majority Coalition.

"In this Circuit, we reserve 'considerable discretion' to review purely legal questions not formally raised in the district court." *United States Lines (S.A.), Inc. v. United States (In re McLean Indus., Inc.)*, 30 F.3d 385, 387 (2d Cir.1994) (per curiam). As discussed above, Defendants moved in the District Court for both a directed verdict and judgment notwithstanding the verdict, albeit on grounds different from the ones we adopt here.[12] Furthermore, our disposition of Camacho's First Amendment claim involves only a question of law and is made based on both undisputed facts and facts viewed in a light most favorable to Camacho's theory of the case. Indeed, the legal principles on which we

---

**11.** Having found that Fuentes' activities were not constitutionally protected, we need not reach the issue of whether Defendants' firing of Camacho adversely affected those rights. We think it is important to note, however, that even when certain activities have been found to be constitutionally protected, not every action taken in retaliation against a plaintiff's constitutionally protected activities will necessarily adversely affect those activities. *See Pierce v. Tex. Dep't of Criminal Justice*, 37 F.3d 1146, 1150 (5th Cir.1994) ("[a]lthough

some actions may have . . . the effect of chilling [plaintiff's] protected speech, they are not actionable").

**12.** However, Minority Leader Brandon's counsel did argue to the District Court that, because Camacho acquired standing based on the rights of a third party, Camacho could not assert any greater rights against retaliation than Fuentes could have asserted on his own behalf.

rely were urged by Camacho at trial. Camacho's proposed jury instructions regarding the violation of Fuentes' First Amendment rights stated that "as a matter of law," Fuentes' "association or alignment with other members of the City Council, dubbed in this case as the '[M]inority [C]oalition,' is also activity protected by the First Amendment." Camacho unsuccessfully defended this proposed instruction against Defendants' objection at the charging conference, arguing that the "First Amendment rights of Mr. Fuentes to associate with Calvi and Balancio cannot be disputed." Camacho therefore cannot argue any unfair prejudice by our disposition of his appeal on a ground not advanced by Defendants' because, ironically, we do so based on legal theories that he advanced and facts that he sought to establish at trial.

### III. *District Court Evidentiary Rulings*

In light of our conclusion that Fuentes' First Amendment claim must fail as a matter of law, we need not pass on Defendants' arguments that the District Court's evidentiary rulings were in error.

### IV. *Legislative Immunity*

In reaching the merits of Camacho's claims, we have not here been presented with the question of whether political decisions of this sort would entitle a defendant to qualified or absolute immunity. We do not address qualified immunity because Defendants' initial appeal of the District Court's denial of qualified immunity was untimely. *See Camacho II,* 236 F.3d at 117. While it is arguable that the defendant City Council members could also have claimed that they were completely shielded from the instant review on the ground that firing a legislative aide is the sort of "legislative act" for which legislators are absolutely immune from suit, *see Morris v.*

*Lindau,* 196 F.3d 102, 110 (2d Cir.1999) ("local legislators, sued in their personal capacities under § 1983, are entitled to absolute immunity from suit for their legislative activities"); *see also Bogan v. Scott–Harris,* 523 U.S. 44, 49, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998), we do not address this issue because Defendants do not appear to have argued it before the District Court and do not press it before our Court.

We note that the Supreme Court has left open the question of whether the employment and discharge of congressional legislative assistants is the sort of legislative action that supports absolute immunity. *See Davis v. Passman,* 442 U.S. 228, 229, 234, 235 n. 11, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). Nonetheless, at least three dissenters in *Davis* thought that a congressman should be immune from such suits on separation of powers grounds:

A Member of Congress has a right to expect that every person on his or her staff will give total loyalty to the political positions of the Member, total confidentiality, and total support. This may, on occasion, lead a Member to employ a particular person on a racial, ethnic, religious, or gender basis thought to be acceptable to the constituency represented, even though in other branches of Government—or in the private sector—such selection factors might be prohibited . . . .

. . . .

At this level of Government—staff assistants of Members—long-accepted concepts of separation of powers dictate, for me, that until Congress legislates otherwise as to employment standards for its own staffs, judicial power in this area is circumscribed. *Id.* at 249–50, 99 S.Ct. 2264 (Burger, C.J., dissenting).

Our sister circuits are to some extent divided on the matter. At least two cir-

cuits have concluded that legislators may be absolutely immune from lawsuits arising out of their personnel decisions. In *Agromayor v. Colberg*, 738 F.2d 55, 60 (1st Cir.1984), the First Circuit held that the minority leader of the Puerto Rico House of Representatives was entitled to absolute immunity from a lawsuit arising out of his decision not to hire the plaintiff as a press officer for the House. The court concluded that, because the job of press officer entailed " 'meaningful' input into the legislative process ... the employment decision should be immunized." *Id.* Likewise, in *Browning v. Clerk, United States House of Representatives*, 789 F.2d 923 (D.C.Cir. 1986), the District of Columbia Circuit held that defendants, including the Speaker of the United States House of Representatives, Thomas P. O'Neill, were immune from an employment lawsuit brought by an Official Reporter of the House. Noting that "[t]here can be little doubt that [the plaintiff's] duties as an Official Reporter were directly related to the legislative process," the Court held that "the congressional action at issue [is shielded] from judicial scrutiny." *Id.* at 929, 930.

However, in *Gross v. Winter*, 876 F.2d 165 (D.C.Cir.1989), the District of Columbia Circuit concluded that a member of the Council of the District of Columbia did not enjoy absolute immunity from claims arising out of the member's firing of a legislative researcher. The court denied the member immunity after noting that "the functions ... legislators exercise in making personnel decisions affecting [legislative aides] are administrative, not ... legislative." *Id.* at 172. Similarly, in *Chateaubriand v. Gaspard*, 97 F.3d 1218 (9th Cir.1996), the Ninth Circuit held that state legislators were not absolutely immune from an employment lawsuit brought by a public information officer for the Washington State Senate Democratic Caucus. Noting that "[t]he decision to demote and to discharge a specific individual is an administrative act," the court held that "[t]he Caucus leadership is thus not entitled to absolute immunity for the conduct [the plaintiff] alleges." *Id.* at 1221.

In sum, we do not address qualified or absolute immunity in this opinion, and we intimate no view on the viability of such defenses in a future case where they are properly raised before our Court.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court is reversed and the case is remanded to the District Court with instructions to enter judgment for Defendants.

JOHN M. WALKER, JR., Chief Judge, concurring.

I write separately because I think that the *Elrod/Branti* policymaker exception is not applicable to elected officials like Fuentes. However, I reach the same result as the majority because I believe that the action taken by Brandon was not an actionable violation of Fuentes's First Amendment rights.

The Elrod/*Branti* exception allowing for removal of policymaking staffers on the basis of their political associations derives from the democratic requirement that the winner of the election be able to carry out his or her policies without hindrance from political aides held over from the previous administration. *See Elrod v. Burns*, 427 U.S. 347, 367, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion); *see also Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). As the *Elrod* Court explained, the policymaker exception is designed to ensure that "representative government not be undercut by tactics obstructing the implementation

of policies of the new administration, policies presumably sanctioned by the electorate." *Elrod*, 427 U.S. at 367, 96 S.Ct. 2673.

Although Fuentes is indeed a policymaker, the *Elrod/Branti* exception does not fit his situation because he is an elected official and not an employee of an elected official. It plainly would not serve the purpose of the policymaker exception—to permit democracy to operate effectively—to extend the exception to elected officials and thereby eliminate any protection of their First Amendment rights. In fact, as the majority notes, Maj. Op., *supra*, at 160, the Court recognized in *Bond v. Floyd* that representative democracy requires that we provide legislators broad freedom of speech. *See* 385 U.S. 116, 135–36, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). A legislator's freedom of association, especially his or her freedom to associate with other legislators, is equally important.

The poor fit between the *Elrod/Branti* exception and elected officials is particularly striking if we posit a case in which a majority of the Council barred Fuentes from Council meetings, or otherwise prevented him from voting, in retaliation for his political associations. If the *Elrod/Branti* policymaker exception applies to elected officials, then a legislative majority could take such acts with impunity despite their anti-democratic nature. But I have no doubt that, were that case before us, we would find that Fuentes retained the right of free association under the First Amendment and that such retaliatory measures violated that right. *See id.* at 135–36, 87 S.Ct. 339; *see also, Scott v. Flowers*, 910 F.2d 201, 213 (5th Cir.1990) (holding that the First Amendment barred the Texas Commission on Judicial Conduct from reprimanding elected judicial official for speech critical of judicial practices); *Miller v. Town of Hull*, 878 F.2d 523, 533

(1st Cir.1989) (holding that the First Amendment prevents the Board of Selectmen from removing elected members of the town redevelopment authority in retaliation for their votes). Thus, I believe that the policymaker exception does not properly apply to elected officials and that courts must stand firm to protect the right of free association in the political arena.

However, as the majority suggests, not every retaliation gives rise to a claim. Maj. Op., *supra*, at 162 n. 10; *see Colson v. Grohman*, 174 F.3d 498, 511 (5th Cir.1999) ("[M]ere criticisms do not give rise to a constitutional deprivation for purposes of the First Amendment."). Moreover, courts should be reluctant to interfere with intra-legislative conduct that falls short of depriving the electorate of representation in the legislature. Although the *Elrod/Branti* policymaker exception does not apply to elected officials, courts are properly guided by the goal identified in *Elrod* of permitting democracy to operate effectively. In the legislative context, this goal is served by recognizing that courts should intervene in only the most severe cases of legislative retaliation for the exercise of First Amendment rights, thereby allowing ample room for the hurly burly of legislative decisionmaking. As the majority opinion observes, it would be inappropriate for courts to attempt to supervise or police the give and take of intra-legislative politics. Maj. Op., *supra*, at 162. In *Coleman v. Miller*, the Supreme Court recognized a distinction between "mere intra-parliamentary controver[sies]," which did not confer standing to sue, and claims of vote nullification, which did establish standing. 307 U.S. 433, 441, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). A similar line exists here: In order to be actionable, intra-legislative retaliation must so severely obstruct a legislator's ability to carry out his legislative functions that his constituents are effec-

tively denied representation in the legislature.

The firing of Camacho did not cross this line. Fuentes remained fully capable of functioning as a councilman and voting on Council proposals. Fuentes was not even deprived of a fixed entitlement granted to each council representative; the assistance of Camacho was a perquisite provided by the Democratic Minority Coalition. Although Camacho worked most closely with Fuentes, he was employed by the Democratic Minority Coalition. Maj. Op., *supra*, at 157. Brandon's use of Democratic Minority Coalition resources to exert leverage on Council members like Fuentes is an ordinary part of the arm-twisting of legislative politics. Therefore, although I disagree with the majority's application of the policymaker exception to elected officials, I find this retaliation too insubstantial to establish a claim. I concur in the judgment.