Mark CUSHMAN, Plaintiff,

v.

VILLAGE OF ILION, NEW YORK; The Board of Trustees of the Village of Ilion, New York; John Gilmartin, individually and/or in his capacity as Mayor; jointly and severally, Defendants.

No. 5:03–CV–451.

United States District Court, N.D. New York.

Jan. 14, 2004.

Trevett, Lenweaver & Salzer, P.C. (Lawrence J. Andolina, Esq., of Counsel), Rochester, NY, for Plaintiff.

Law Offices of Frank Miller (Frank W. Milller, Esq., Charles E. Symons, Esq., of Counsel), East Syracuse, NY, for Defendants.

## MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiff Mark Cushman ("plaintiff") brought suit against defendants Village of Ilion, New York ("village"), the village board of trustees ("board"), and John Gilmartin ("Gilmartin"), individually and/or in his capacity as village Mayor (collectively, "defendants"), alleging two groups of federal claims [1]: (1) deprivation of a property interest without due process of law by failing to afford plaintiff notice and opportunity to be heard prior to his termination,

in violation of his Fourteenth Amendment procedural due process rights; and (2) termination on the basis of and in retaliation for the exercise of his constitutional right to political party affiliation, in violation of his Fourteenth Amendment equal protection and substantive due process rights.[2]

Defendants have filed a motion to dismiss pursuant to Fed.R.Civ.P. 12, and/or for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff opposed. Oral argument was heard on October 10, 2003, in Utica, New York. Decision was reserved.

## II. FACTUAL BACKGROUND

The facts relevant to plaintiff's federal claims are as follows.

By board resolution dated September 15, 1976, the position of Village Administrator was created to coordinate the village's governmental departments and agencies, and to make recommendations to the board on certain issues. At a January 12, 2000, board meeting, a motion was unanimously passed appointing plaintiff Village Administrator. On February 9, 2000, plaintiff signed the required oath of office, and it was filed. Though several officials allegedly witnessed his taking the oath, neither the village Clerk nor any other village official signed the document attesting thereto.

The village held elections every two years. After the June 2000 elections, defendants claim that plaintiff was reappointed Village Administrator. It does not appear as though plaintiff specifically contests this alleged fact. Plaintiff did not file a new oath of office upon his reappointment, but faithfully discharged his duties until June 5, 2002.

On June 4, 2002, after contentious campaigning, Gilmartin, a Democrat, won the mayoral election. That night, he and new-

---

1. Plaintiff also asserts state law claims for abuse of process and defamation.

2. See infra note 6.

ly elected board members were sworn into their offices. At a board meeting the next day, June 5, 2002, plaintiff was terminated as Village Administrator after first being offered a chance to resign voluntarily. The minutes of the meeting note that "due to the current makeup of the board the services of an administrator are not needed." (Docket No. 9, Ex. C.) Defendants claim that this was because Gilmartin, who as Mayor was on the board, planned to be a full-time mayor, and the position of Village Administrator had been created at a time when the then-mayor assumed only part-time duties, making it difficult for him to complete all the tasks eventually delegated to the administrator. Plaintiff claims that his termination was due solely to his political affiliation as a Republican.

## III. DISCUSSION

Defendants have moved to dismiss the complaint and/or for summary judgment pursuant to Federal Rules of Civil Procedure 12 and 56.

### A. *Federal Rules of Civil Procedure 12 and 56 Standards*

In deciding a Rule 12(b)(6) motion, a court "must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint 'unless it appears beyond a reasonable doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief.'" *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995). However, conclusory allegations that merely state the general legal conclusions necessary to prevail on the merits and are unsupported by factual averments will not be accepted as true. *See, e.g., Clapp v. Greene,* 743 F.Supp. 273,

276 (S.D.N.Y.1990); *Albert v. Carovano,* 851 F.2d 561, 572 (2d Cir.1988).

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. New York State Dep't of Correctional Service,* 180 F.3d 426, 436 (2d Cir.1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson,* 180 F.3d at 436; *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983). Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. At that point the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348.

### B. *Due Process—Second, Third, Fifth, and Sixth Causes of Action*

■ Plaintiff claims in his *second, third, fifth,* and *sixth* causes of action that he was

deprived of a property interest in the Village Administrator position without notice and opportunity to be heard, in violation of his federal due process rights. To succeed on these claims, plaintiff must prove: (1) that he indeed had a constitutionally protected property interest in the position at the time he was terminated; and (2) that he was not given the proper due process before being deprived of that interest. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 313 (2d Cir.2002). As it is dispositive, only the first requirement will be considered.

 There is no question that plaintiff's due process claims must fail unless he had, at the time he was terminated, a constitutionally recognized property interest in his position as Village Administrator. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Property interests in employment "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules of understandings that stem from an independent source such as state law." *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 212 (2d Cir.2003).

 Public employees who can only be discharged for "just cause" are entitled to procedural due process protections before being terminated. *See Otero v. Bridgeport Hous. Auth.*, 297 F.3d 142, 151 (2d Cir. 2002). Section 36 of the Public Officer's Law lists several grounds—"misconduct, maladministration, malfeasance or malversation"—for removing "village ... officer[s]" that the Second Circuit has indicated are equivalent to just cause, *see Rubino v. City of Mount Vernon*, 707 F.2d 53, 54 (2d Cir.1983), and offers procedural protections to covered employees prior to removal. The position of Village Administrator has been held to fall within the definition of "officer" in Section 36. *See Enos v. Vill. Of Seneca Falls*, 288 A.D.2d 853, 732 N.Y.S.2d 785, 786 (4th Dep't 2001). As the Second Department has indicated, a "public officer" is one " 'whose position is created, and whose powers and duties are prescribed, by statute and who exercises a great deal of initiative and independent judgment.' " *Stork v. Bd. of Trustees of Vill. of Medina*, 179 A.D.2d 1058, 579 N.Y.S.2d 797 (2d Dep't 1992) (citation omitted). Here, the position of Village Administrator was created by a lawfully executed board resolution, and involved a great deal of independent judgment, *see infra* Section C, so it would appear as though he falls within the parameters of Section 36.

Whether plaintiff, at the time of his termination, had a property interest in his employment as Village Administrator by virtue of Section 36 depends upon two issues, both of which must be answered in the affirmative for him to prevail: (1) whether plaintiff, as a public officer, filed a timely oath of office upon his appointment in January 2000 and/or reappointment in June of 2000; and (2) whether plaintiff, at the time of his termination, was "in office" within the meaning of Section 36. Because as a matter of law plaintiff did not properly file an oath of office, the second issue need not be discussed.[3]

Because plaintiff was reappointed in June of 2000, under Section 10 of the Public Officer's Law, he was required to take and file a properly executed oath of office before becoming entitled to discharge his official duties as Village Administrator upon reappointment. He had thirty (30) days from the time he was notified

---

**3.** However, it is here opined that, had plaintiff properly executed and filed an oath office, he was "in office" at the time of his termination on June 5, 2002.

of his reappointment in June of 2002, or from the commencement of his term of office. N.Y. Public Officer's Law § 30(1)(h). The duty to file the oath of office upon reappointment "is personal to plaintiff, it is an act he is required to do and the office became vacant by the mere failure to file the oath, whether or not the defendants knew or were chargeable with notice that plaintiff had failed to file his oath, and they are not required to make any declaration or give any notice" to plaintiff of his obligation. *Boisvert v. Ontario County*, 89 Misc.2d 183, 391 N.Y.S.2d 49, 51 (N.Y.Sup.Ct.), *aff'd*, 57 A.D.2d 1051, 395 N.Y.S.2d 617 (4th Dep't 1977). Because there is no evidence—and plaintiff does not purport that any exists—that plaintiff filed the oath of office within this time frame after his reappointment, "his [re]appointment was vitiated and his office became vacant" under Section 30, *Staniszewski v. Lackawanna Mun. Hous. Auth.*, 191 A.D.2d 1048, 595 N.Y.S.2d 160 (4th Dep't 1993), as of the end of the thirty days following reappointment, *Greshin v. Suffolk County Legislature*, 77 A.D.2d 596, 431 N.Y.S.2d 991, 993 (2d Dep't 1980) (Gullota, J., concurring in part, dissenting in part), *adopted*, 53 N.Y.2d 670, 438 N.Y.S.2d 1000, 421 N.E.2d 120 (1981).[4]

Assume that plaintiff was not required to file a properly executed oath of office upon reappointment in June 2002—perhaps because the board resolution creating the position, and the board meeting appointing plaintiff, stated no period of service, or otherwise—and that the relevant document to be analyzed is the oath of office signed by plaintiff upon his original appointment in January 2000. In other words, he only had to file an oath of office once, upon his original appointment. As noted, the obligation to timely file a properly executed oath of office falls to plaintiff. Thus, he was responsible for ensuring the document was properly filed and free of substantive or technical deficiencies, including the lack of a signature attesting to his taking and signing the oath. He did not do so. Although the oath of office upon appointment in January 2000 was signed by plaintiff and filed in February, it was never signed by the Clerk or anyone else attesting thereto. Though sympathy is most certainly expressed for plaintiff's predicament, the office, as a matter of law, must be considered vacant at the time plaintiff was terminated.

Though the office of Village Administrator was considered vacant thirty days after plaintiff's appointment or reappointment, or notice thereof, there is no question that he continued to fulfill the duties of the office until his termination on June 5, 2002. Regardless of whether plaintiff was considered a "holdover" within the meaning of Section 5 of the Public Officer's Law, the office of Village Administrator was deemed vacant during this time. Accordingly, regardless of whether the board had the authority to abolish or terminate the position, plaintiff had no constitutionally protected property interest at the time he was terminated on June 5, 2002. Therefore, whether or not he was given proper due process by his termination need not be discussed. His federal due process claims will be dismissed.

4. It should be noted that the actions of plaintiff, purportedly as Village Administrator, are not invalidated by reason of the defective oath of office. Rather, such acts are "as valid and of as full force and effect as if such oath had been duly taken and filed[.]" N.Y. Public Officer's Law § 15; *see also County of Ontario v. W. Finger Lakes Solid Waste Mgmt.*, 167 A.D.2d 848, 561 N.Y.S.2d 954, 955 (4th Dep't 1990) ("Under the de facto officer doctrine, the acts of one who carries out the functions of a public officer under color of authority are generally valid as to third persons and the public, and hence immune from collateral attack, notwithstanding irregularities in the manner in which the officer was appointed").

## C. Political Affiliation—Seventh, Eighth, Ninth, and Tenth Causes of Action [5]

In plaintiff's *seventh, eighth, ninth,* and *tenth* causes of action,[6] he claims he was improperly terminated on the basis of and/or in retaliation for the exercise of his constitutionally protected right of political affiliation.[7] "[A]ffiliating oneself with a political party or faction is [indeed] protected by the First Amendment." [8] *Camacho v. Brandon,* 317 F.3d 153, 160 (2d Cir.2003). The Supreme Court, first in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and then in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), has set forth the standards governing the right of a public employee to politically affiliate or associate, and the right of a public employer to take action against the employee because of such affiliation or association. *See McEvoy v. Spencer,* 124 F.3d 92, 98 (2d Cir.1997).

As a general rule, dismissals on the basis of political affiliation—sometimes referred to as "patronage dismissals"—are prohibited. *Elrod,* 427 U.S. at 372–73, 96 S.Ct. 2673. The prohibition, however, is not absolute, and a public employer may terminate an employee on the basis of political affiliation if it "further[s] some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end[.]" *Id.* at 363, 96 S.Ct. 2673. Ensuring that implementation of the policies of a new administration not be undermined by politically disloyal employees is an important enough government interest to justify terminating some, but not all, of these dismissals. *Id.* at 367, 96 S.Ct. 2673. Particularly, if the employee at issue is a "policymaker," dismissal on the basis of political party affiliation is appropriate; if the employee is a lower level member of the administration, it is not. *Id.*

In *Branti,* the Court refined the policymaker exception to the prohibition against patronage dismissals, explaining that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather the question is whether the hiring [or firing] authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. 1287. "[A]s the *Branti* Court observed, political affiliation is not always relevant even to the job of a

5. For the purposes of this discussion, it will be assumed, without deciding, that although the office was officially vacant, by performing the duties of Village Administrator, plaintiff was employed in some capacity and was entitled to be free from improper termination or retaliation.

6. In this regard, plaintiff devotes his memorandum of law in opposition to arguing that political affiliation may not be used as a basis for the termination of a public official under *New York law.* (Docket No. 17, pp. 2–5.) Regardless of whether the standards are the same under federal and state law, however, plaintiff in the complaint makes no claim for this under New York law. Instead, the *seventh, eighth, ninth,* and *tenth* causes of action all are based on federal law, specifically, the equal protection and substantive due process clauses "of the Fourteenth Amendment of the United States Constitution" as enforced pursuant to 42 U.S.C. § 1983. (Docket No. 1, ¶¶ 95, 101, 107, 116.)

7. For the purposes of this discussion, it will be assumed without deciding that plaintiff was, in fact, terminated because of his political party affiliation.

8. Although plaintiff asserts the *ninth* and *tenth* causes of action under the auspices of the substantive due process clause of the Fourteenth Amendment, it is difficult to see how those particular rights are implicated, as there are no allegations of conscience-shocking behavior, and it is doubtful, in any event, that terminating an upper level employee on the basis of political affiliation fits that description.

policymaker." *Bavaro v. Pataki,* 130 F.3d 46, 49 (2d Cir.1997).

While this would appear to significantly diminish a public employer's ability to terminate employees, even upper-level ones, on the basis of political affiliation, the Second Circuit has interpreted *Branti* "as saying that political affiliation is an appropriate requirement when there is a rational connection between shared ideology and job performance, a reading which would exempt most policymaking and confidential employees.... Any other decision would severely handicap an incoming administrator's ability to carry out his proposed policies, thereby undercutting the effects of the electorate's vote." *Savage v. Gorski,* 850 F.2d 64, 68 (2d Cir.1988).[9] In other words, the term "policymaker" is " 'convenient shorthand for a person occupying a position calling for party loyalty.' " *McEvoy,* 124 F.3d at 99 (quoting *Regan,* 984 F.2d at 580). Whether a person is a policymaker is a question of constitutional law for the court. *Gordon,* 110 F.3d at 888–89.

When determining if there exists a connection between "shared ideology and job performance," the focus is not on what the employee actually did in the course of his or her job, or whether he or she was actually involved in policymaking decisions; rather, the focus is on the "inherent duties of the position." *Vona,* 119 F.3d at 207; *Gordon,* 110 F.3d at 888. The inherent duties are most often found in an official job description, and the more vague or broad the description, the more likely the employee works in a policymaking capacity. *Vona,* 119 F.3d at 207–08. The Second Circuit has enunciated several non-exhaustive, non-exclusive factors to be examined when determining if the inherent duties of a position are rationally connected to a need for shared ideology, including whether the employee at issue: "(1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders." *Vezzetti,* 22 F.3d at 486.

The last five factors take on "primary importance" in the analysis, and collectively ask "whether the employee in question is empowered to act and speak on behalf of a policymaker, especially an elected official." *Gordon,* 110 F.3d at 890; *see also Regan,* 984 F.2d at 580 ("There is no likely circumstance in which a shared ideology is more important than when an elected official appoints a deputy who may act in his or her stead"). If it is proven that an employee is to routinely act and speak on behalf of a policymaker, whether the last five factors are satisfied "can only be answered in the affirmative." *Butler,* 211 F.3d at 744.

9. This broad reading given to the policymaker exception by the court in *Savage* has predictably resulted in the exemption from First Amendment protection of most mid- to upper-level public employees. *Gordon v. County of Rockland,* 110 F.3d 886, 890 (2d Cir.1997) (citing *Vezzetti v. Pellegrini,* 22 F.3d 483, 486 (2d Cir.1994)) (town superintendent of highways); *Regan v. Boogertman,* 984 F.2d 577, 580 (2d Cir.1993) (deputy tax receiver); *Savage,* 850 F.2d at 65 (confidential secretary to director of correctional facility, coordinator for pretrial release services, first deputy service officer for veterans service agency); *see also Camacho,* 317 F.3d at 162 (city council member); *Butler v. N.Y. State Dep't of Law,* 211 F.3d 739, 744 (2d Cir.2000) (deputy bureau chief of litigation for state attorney general); *Bavaro,* 130 F.3d at 49 (associate and assistant counsel for legal affairs division, bureau of medical misconduct of state department of health); *McEvoy,* 124 F.3d at 104 (police commissioner); *Vona v. County of Niagara,* 119 F.3d 201, 209 (2d Cir.1997) (assistant social services attorney).

By resolution dated September 15, 1976, the position of Village Administrator came into being in order "to create central administrative responsibility to coordinate and control all of the divisions and agencies of Village government." (Docket No. 9, Ex. B; Docket No. 15, Ex. B.) The primary duties of the Village Administrator were to "develop over-all policies and standards; assist operating agencies in application of policy; and coordinate the work of departments to assure smooth operation of [the] Village government." *Id.* He or she was also specifically responsible for, *inter alia:* (1) "[i]mprov[ing] budget procedures and decid[ing] priorities"; (2) "[m]ak[ing] recommendations to Village Board regarding operations of Departments"; (3) "[m]ak[ing] recommendations and advis[ing] Board of Village business"; (4) "[w]orking closely with Village Attorney"; (5)[a]ttend[ing] negotiating sessions with Departments"; (6) "[a]ttend[ing] regular Board meetings and others upon request"; (7)[p]rovid[ing] direct line of communication for taxpayer complaints and problems ... for action from employee(s) of correct department"; (8) "[being an] [e]x-officio member of Planning, Traffic, Urban Renewal and Zoning Boards"; and (9) "[c]oordinat[ing] and control[ing] use of any [federal and state] funds received." *Id.*

Clearly, the Village Administrator was vested with considerable responsibility and discretion regarding major functions of village government—including budget- and operations-related matters as well as community relations—that the then-mayor did not believe he could handle. With respect to the latter, the Village Administrator was essentially a public face for dealing with citizen concerns and complaints. The Administrator also was to serve as a chain of command link between the various village departments and agencies and the board of trustees, and advise and make recommendations to the board on several issues.

The Village Administrator was not just to execute specifically delineated orders. He or she was to be creative and innovative, and was installed to do the legwork in solving major village puzzles, and coordinating the activities of, essentially, the entire government. Independent judgment was most certainly required, if not an outright indispensable job requirement. Embodied in many decisions the Village Administrator was to make were key policy decisions regarding finance, programs, and interaction with the community. It must be stated as a matter of law that this position fits within the admittedly broad confines of the policymaking definition as interpreted by the Second Circuit. As such, it was permissible for the board to terminate plaintiff on the basis of his political party affiliation, and the *seventh, eighth, ninth,* and *tenth* causes of action will be dismissed.[10]

### D. Remaining State Claims

As no federal claims remain in this case, jurisdiction over the state law claims asserted by plaintiff—in the *first* and *fourth* causes of action—is declined.

## IV. CONCLUSION

Because of his failure to file a properly executed oath of office, plaintiff did not have a constitutionally protected property interest in his employment as Village Administrator at the time he was terminated on June 5, 2002. Further, it was permissible for plaintiff to be terminated on the basis of political affiliation.

Accordingly, it is

ORDERED that

---

**10.** As the *eleventh* cause of action, which alleged conspiracy to violate his equal protec-

tion rights, depended on the success of these claims, it, too, must be dismissed.

1. Defendants' motion to dismiss and/or for summary judgment is GRANTED;

2. The *first* and *fourth* causes of action in the complaint are DISMISSED without prejudice; and

3. The *second, third, fifth, sixth, seventh, eighth, ninth, tenth,* and *eleventh* causes of action in the complaint are DISMISSED with prejudice.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.